491 So.2d 768 (1986)
Arthur A. LANCASTER, et al, Plaintiffs-Appellants,
v.
The PETROLEUM CORPORATION OF DELAWARE, et al., Defendants-Appellees.
No. 85-641.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1986.
Rehearing Denied August 13, 1986.
*769 Sessions, Fishman, Rosensen, Boistontaine & Nathan, Robert L. Barkley, Jr., and Michael R. Allweiss, New Orleans, for plaintiffs-appellants.
*770 Guglielmo, Lopez & Tuttle, James T. Guglielmo, Opelousas, Gordon, Arata, etc., Ewell E. Eagan, Jr. and Gerald F. Slattery, Jr., and William T. D'Zurilla, New Orleans, Onebane & Associates, Edward C. Abell, Jr., Lafayete, for defendants-appellees.
Before STOKER and KING, JJ., and COX, J. Pro Tem.[*]
KING, Judge.
This appeal presents the issue of the correctness of the judgment of the trial court, rendered after a trial on the merits, on the various claims of the parties.
This suit was brought by Arthur A. Lancaster (hereinafter referred to as Lancaster) and Humble Exploration Company (hereinafter referred to as Humble) against Petroleum Corporation of Delaware (hereinafter referred to as Petcorp) for damages sustained as a result of (1) the alleged negligence of Petcorp involved in the blowout of an oil well near Jennings, Louisiana, and (2) an alleged breach of a written operating agreement between various owners of mineral interests in the oil lease and Petcorp. Petcorp denied these allegations and made third party demands against Goldrus Drilling Company (hereinafter referred to as Goldrus) and The Western Company (hereinafter referred to as Western), and reconvened against Humble to recover expenses it paid in connection with the operation of the well. After trial on the merits the trial court ruled that Petcorp was not negligent in causing the well blowout and did not breach the operating agreement. The claims of Lancaster and Humble against Petcorp were dismissed at plaintiff's cost. The trial court rendered judgment in favor of Petcorp and against Humble on the reconventional demand. The trial court dismissed Petcorp's third party demand against Goldrus and Western.
Lancaster and Humble timely appeal the trial court decision. We affirm in part, reverse in part, and render judgment.

FACTS
The evidence contained in the record of the lengthy trial reveals the following facts. Plaintiff-appellant, Arthur A. Lancaster, acquired an oil and gas lease covering certain lands in Jennings, Louisiana. Lancaster assigned interests in the lease to Humble Exploration Company, Inc., Petroleum Corporation of Delaware, Forman Exploration Company, and Carolina Gas Exploration Company. Lancaster retained a twenty-five percent (25%) interest after payout (a back-in interest) in the well. The various owners of mineral interests in the lease entered into a written operating agreement on September 26, 1976, whereby Petcorp undertook the duties of well operator, and all other parties became non-operating partners.
On November 15, 1976, Petcorp contracted with Goldrus to perform the actual drilling of a test well (Anne H. Hebert No. 1 Well). Petcorp also contracted with Western for the cementing operations on the well. The test well was completed on March 9, 1977, and on the next day, Petcorp recommended to its partners that the well be completed as a producing unit. Petcorp engaged Drew Cornell and Associates to conduct general completion operations at the well. Arthur Roy Riley was the on-site company representative of Petcorp in charge of well operations. Prior to the morning of March 16, 1977, the drilling operations had proceeded normally, with there being no indication that this well was anything but a normal South Louisiana well. Though some minor problems had been experienced during drilling, the hole had been stable for days prior to March 16th.
The Anne H. Hebert No. 1 Well was a typical South Louisiana high pressure well, no different from the many other wells in *771 the Jennings, Louisiana area. On the evening of March 15, 1977, the 5-½ inch production casing was hung and cemented into place. The crew then began to rig down and clean up the well site. There was a 2 inch valve located on the annular space between the 5-½ inch production casing and the outer 9-5/8 inch casing. This valve was left open according to the instructions of Mr. Riley. The crew was generally instructed to watch the well.
At about 6:00 A.M. on March 16th, the Goldrus crew was working approximately 60 feet from that valve when Jimmy Smith, the derrick hand, walked by the valve and noticed that the well had started to flow through the valve. Smith yelled out to the other crew members that the well was flowing, and immediately ran to summon the toolpusher, Junior Bell.
Paul LeJeune, the driller, heard Smith's call, and immediately ran to check out the problem. LeJeune was only 50 or 60 feet from the valve when he heard Smith's warning. LeJeune testified that the well was already blowing out and drilling mud was being flung everywhere.
Mr. Bell arrived at the valve no more than three minutes after Smith first noticed the activity at the valve. Bell and LeJeune, despite their efforts to close off the valve, failed to stop the blowout. Unable to stop the blowout, the drilling crew evacuated the well site. The Anne H. Hebert No. 1 Well continued to blow out for 24 hours before it bridged over and ceased blowing out.
On March 21, 1977, Petcorp sent a telegram to each of the non-operating partners, informing them that it was immediately resigning as operator of the well and advising the non-operators of its intent to plug and abandon the well unless another party took over operation of the well. On March 25, 1977, Petcorp threatened to immediately plug the well unless another operator could be found by 5:00 P.M. that same day.
The non-operators, faced with the possibility of losing the entire operation, hurriedly began negotiating to obtain a new operator. At the last moment, Goldking Properties (hereinafter referred to as Goldking) agreed to take over as operator but only on the condition that Lancaster turn over a substantial portion of his backin interest in the well to it. This was agreed to.
Goldking took over operations on March 26, 1977 and continued as operator of the well until April 20, 1977, when Forman Exploration Company took over as operator of the well. The well was recompleted and produced oil and gas in paying commercial quantities until late 1981, when it was plugged and abandoned with the consent of all parties. The Anne H. Hebert No. 1 Well never reached the point of payout whereby investors with back-in interests, such as Lancaster, would begin participating in profits.
This suit was filed on June 2, 1977 by Lancaster and Humble who claim that the negligence of Petcorp, while drilling and completing the well, caused the blowout, and that Petcorp's resignation as operator of the well was a bad faith breach of the written operating agreement, all of which caused monetary damages to plaintiffs. Petcorp denied these allegations and made third party demands against the drilling contractor, Goldrus, and the cementing company, Western, stating that if any negligence occurred, which caused the blowout, it was that of the third party defendants. Petcorp also reconvened against Humble for recovery of expenses that it paid in connection with the well. After extensive discovery and almost five years later, trial was held. The trial lasted from April 12, 1982 until May 5, 1982. The trial court took the matter under advisement and after the record was transcribed and post-trial briefs filed, it rendered judgment in February, 1985. Judgment was rendered on the main demand in favor of Petcorp, finding no negligence on the part of Petcorp that caused the blowout and no breach of contract on the part of Petcorp, and the claim of Lancaster and Humble against Petcorp was dismissed. Petcorp's third party claims against Western and *772 Goldrus were accordingly dismissed. The trial court rendered judgment on the reconventional demand in favor of Petcorp and against Humble for the full amount of the expenses claimed by Petcorp. This portion of the judgment has not been appealed and is now final.
Lancaster and Humble timely appealed. Humble has now dismissed its appeal. Lancaster alleges as assignments of error that:
(1) The trial court erred in failing to find that Petcorp breached its contract with Lancaster;
(2) The trial court erred in failing to award damages to Lancaster for the losses he sustained as a result of the breach of contract by Petcorp;
(3) The trial court erred in failing to award attorney's fees to Lancaster for Petcorp's bad faith breach of its contract;
(4) The trial court erred in failing to find that Petcorp committed gross negligence and/or failed to take all reasonable precautions to prevent blowouts and/or failed to perform in a good and workmanlike manner in its duties as operator of the Anne H. Hebert No. 1 Well;
(5) The trial court erred in failing to find that Petcorp's actions and/or inactions were the cause-in-fact of the blowout of the oil well;
(6) The trial court erred in dismissing Lancaster's claim for reservoir damage; and
(7) The trial court erred in taxing against Lancaster all costs of the proceeding including the expert witness fees of Louis Records, Paul Montgomery, and I.H. Delatte.
For convenience, Lancaster's assignments of error will not be discussed in this order.

DE FACTO JUDGE
Lancaster first questions the validity vel non of the written judgment the trial court signed for the simple reason that the judgment was read and signed after the trial judge's term of office had expired. After his retirement, the trial judge was appointed judge pro tempore of the Thirty-First Judicial District Court by the Louisiana Supreme Court effective through February 28, 1985, for the purpose of deciding any matters taken under advisement by him prior to his retirement and to assist the newly elected judge of the court as may be needed. The trial judge rendered written reasons for judgment in this case, which were dated and filed on February 14, 1985. The written judgment was dated as read and signed on February 28, 1985 and was filed on March 6, 1985. However, in a sworn affidavit of the Clerk of Court, filed in the record, it appears that the trial judge dated the judgment February 28, 1985 when he actually signed it on March 6, 1985, which was after his appointment as judge pro tempore had expired. However, the time of the reading and signing of the judgment is of no import, since the trial judge, even though not technically in office, is considered a judge defacto whose acts are valid and binding for the purpose of concluding unfinished business. City of Baton Rouge v. Cooley, 418 So.2d 1321 (La.1982). See also 46 Am.Jur.2d, Judges, § 245 (1969) and 48A C.J.S., Judges, § 63 (1981). If the judgment was invalid, as the plaintiff now suggests, there would exist no signed judgment from which the plaintiff could appeal and seek relief. Therefore, we find that the judgment of the trial court which was read and signed in this case is valid and has legal effect.

REASONS FOR JUDGMENT ENTITLED TO FULL WEIGHT
Lancaster also suggests to this Court that the trial court's findings of fact, as set forth in its Reasons for Judgment, are entitled to no weight because these findings were prepared by defense counsel. Defense counsel admitted both in brief and at oral argument that he prepared the Reasons for Judgment and the Judgment at the request of the trial judge. The plaintiff, however, cites only the First Circuit case of Miller v. Smith, 391 So.2d 1263 (La.App. 1st Cir.1980), affirmed on different *773 grounds, 402 So.2d 688 (La.1981), for the proposition that no real value should be placed on the trial court's reasons for judgment when they are prepared by counsel. Though Miller was affirmed by our Supreme Court, that affirmance was not based on this particular issue, but rather upon the fact that the evidence presented did not support the trial court's findings.
Though it is not a common practice in Louisiana for the trial court to allow counsel to prepare the Court's reasons for judgment, it is an accepted practice. [See J. Lemmon's dissent in Miller v. Smith, 402 So.2d 688 (La.1981)]. This procedure is also permitted in Federal courts, and the United States Supreme Court has stated that where counsel has prepared the Court's reasons for judgment:
"Those findings, though not the product of the workings of the district judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." United States v. El Paso Natural Gas Company, 376 U.S. 651, 656, 84 S.Ct. 1044, 1047, 12 L.Ed.2d 12 (1964).
See also, Cooper v. Keyes Offshore, Inc., 421 So.2d 385 (La.App. 1st Cir.1982).
Review of the record does not reveal any indication that the trial court's Reasons for Judgment, even if prepared by defense counsel, are not supported by the evidence. Accordingly, they are entitled to full weight and will be considered by this Court.

STANDARD OF REVIEW
In Louisiana, jurisdiction of the appellate courts extends to both facts and law. Louisiana Constitution of 1974, Art. V, § 10(B). In regard to appellate review of factual determinations made by the trial court, it is clear that:
"When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Canter v. Koehring Company, 283 So.2d 716, at page 724 (La.1973).
However, the Louisiana Supreme Court has further stated that:
"[t]he appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous)." Arceneaux v. Domingue, 365 So.2d 1330, at page 1333 (La.1978).
The case at hand, especially in regard to the alleged negligence of Petcorp, which is a question of fact, centers directly upon the trier of fact's evaluation of the credibility of the witnesses, both fact and expert.

NEGLIGENCE
Lancaster alleges that the trial court erred in finding that the Anne H. Hebert No. 1 Well did not blow out as a result of any negligence on the part of Petcorp or any of its agents, sub-contractors or employees.
Article 5 of the operating agreement provided that Petcorp was liable only for gross negligence. However, the trial court in its Reasons for Judgment found that there was simply no negligence on the part of Petcorp, its agents, subcontractors or employees. Review of the record clearly indicates that the trial court did not commit *774 manifest error in finding that there was no negligence on the part of Petcorp or those persons it was responsible for. Necessarily this finding of fact would also include a finding of fact that there was no gross negligence on the part of Petcorp.
The entire issue of negligence rests entirely upon the trial court's evaluation of the testimony and credibility of the expert witnesses, especially that of Mr. Louis Records. Lancaster maintains that no import should have been accorded to the testimony of Mr. Records because his entire deposition, which was admitted into evidence, impeaches him. The trial court, however, although it allowed the deposition into evidence, was obviously of the opinion that the deposition did not bring to light any unexplained inconsistencies in Mr. Records' testimony. Our review of his testimony and his deposition reveals little, if any, inconsistency between his testimony at trial and his testimony in his deposition. Review of the record clearly indicates that the trial judge accepted the expert testimony of Mr. Records and placed great value on his opinions. We find no error in his doing so.
Lancaster takes great issue with the action of Mr. Riley in leaving the 2 inch valve open. Lancaster attempts to establish that Riley acted negligently in leaving the valve open, and that this was the cause-in-fact of the blowout. However, the totality of the evidence presented at trial does not reveal that Riley's actions regarding the valve were negligent, nor that the open valve was the cause of the blowout.
The experts who testified differed in their opinions as to whether or not the valve should have been left open as the trial court noted in its Reasons for Judgment. Though Lancaster's experts, Mr. Bazer, Mr. Dausch and Mr. O'Connor, testified that they felt that the valve should have been closed, they conceded that the valve could have been left open if it was monitored. They also conceded that they could not say that Mr. Riley had done anything wrong. Evidence was also presented, through the testimony of those who witnessed the blowout, that members of the drilling crew were instructed to watch and were watching the well.
There was abundant testimony to the effect that it was a common oil field practice to leave the valve open. Mr. Records, as well as Mr. Riley and Mr. Yount, testified to this fact, and in addition, Mr. Records stated that in his opinion the open valve did not cause the blowout, but rather, prevented an even worse disaster from occurring, as this was not an underground blowout. Lancaster's experts also conceded on cross-examination that pressure may have built up inside the pipe and caused an underground blowout had the valve been closed.
All but one of the experts who testified agreed that the most probable cause of the blowout was a phenomenon now known as gelation, whereby the cement goes through a transformation into a gelatinous stage and loses its normal gradient (in this instance 16.5 pounds) and assumes the lesser gradient of water (8.3 pounds). This results in a loss of the hydrostatic head (pressure) which allows the pressure of the formation to overcome the pressure of the fluids in the hole, thus causing a blowout. Even Lancaster's expert, Mr. O'Connor, who offered another view, conceded that the gelation theory was possible.
Equally clear, as evidenced by the testimony of the expert witnesses, is the fact that this phenomenon was not generally known or understood in 1977, at the time of the blowout, but only came to light and to the attention of the petroleum industry in the years following the blowout. Mr. Records, as well as others, testified that the well would have blown out regardless of whether the valve was open or closed. According to Mr. Records, the valve had nothing to do with the blowout.
Lancaster suggests to this court that the testimony of Mr. Records and other defense experts should be discounted because they based their opinions on the allegedly erroneous premise that the well exploded suddenly in a surge that was impossible *775 to control. But Lancaster's assessment of their testimony is incorrect. The defense experts did testify that their opinions were based on the fact that the blowout occurred quickly. This is totally supported by the testimony of the members of the drilling crew on location at the time of the blowout. The members of the drilling crew testified that they observed the well begin to flow and that within a matter of minutes the well was blowing out of control. We do not find that the trial judge was manifestly in error in concluding that the blowout occurred rapidly and that no effective measures could have been taken to stop the blowout after it started.
Lancaster also alleges that Petcorp (through Riley) acted negligently in failing to keep the well cellar (where the valve was located) pumped out during the completion operations. However, the record is devoid of any evidence showing that the cellar was not pumped out. In fact, testimony in the record shows that the cellar was pumped out.
Lancaster also contends that Petcorp and/or Western failed to use proper cementing materials and that this constituted negligence. However, again the record does not support Lancaster's contention. The majority of witnesses at trial testified that the cement that was used at the time of the blowout was a proper and commonly used material for wells like the Anne H. Hebert No. 1 Well. Though one of Lancaster's experts, O'Conner, testified that a low water loss cement should have been used, all of the other experts disputed this contention. They were of the opinion that such a practice would not have helped, but rather would have created a problem with the well because of the increased likelihood of pushing the cement column back into the formation.
Lancaster also contends that Petcorp acted negligently in beginning to rig down and hang the casing immediately after cementing the production casing, without allowing the cement to set. Lancaster relies solely on the opinion of Mr. Dausch, who simply stated that he, personally, would have waited twelve to twenty-four hours for the cement to set. However, all the other witnesses, including Lancaster's expert, Bazer, agreed that Petcorp's actions were prudent and in accord with the common and accepted practice of the oil industry. They also testified that it was better to hang the casing while the cement was wet in order to avoid the possibility of cracking the cement.
Lancaster also alleges that Petcorp was negligent because it failed to install a pressure gauge on the valve. However, review of the record reveals no evidence whatsoever to indicate that a gauge was a necessary instrument, or that not having one constituted negligence.
Lancaster also claims that Petcorp used second-hand and rejected pipe in the drilling operations. The record clearly shows that all pipe used was properly inspected and that it passed that inspection.
Lancaster further alleges that scratchers and centralizers were not used and that this constituted negligence. But, the evidence shows that both were used. The experts also generally agreed that the use of scratchers was overrated and often of no benefit at all.
Lancaster additionally argues that Petcorp was negligent because it did not weigh the spacer (the material injected between the cement and the drilling mud). He maintains that the spacer used was thirteen pounds instead of the required sixteen and one-half pounds. However, it is clear, as evidenced by the testimony and the documents introduced at trial, that the spacer did indeed weigh 16.5 pounds.
Lancaster finally maintains that Petcorp failed to properly check the mud returns and that this constituted negligence. Lancaster also maintains that Petcorp was negligent in beginning to cement while mud returns were still 16.2 instead of 16.5 pounds. Once again the record fails to support Lancaster's position. The record reflects that although cementing began while the return mud weight was 16.2, the *776 mud weight rose to 16.5 during the cementing operations. The evidence also reflects that Petcorp's actions in beginning to cement at that time were perfectly prudent.
Once again it must be stated that determination of the issue of negligence depends largely upon the trial court's evaluation of the testimony and credibility of the witnesses. In light of the fact that Lancaster's own experts in many instances did not support Lancaster's allegations that the actions of Petcorp were negligent and the cause of the blowout, it is not surprising that the trial court obviously found defendants' experts more persuasive. We therefore find that the trial judge's factual conclusion that Petcorp was not negligent in causing the well blowout, which is supported by the evidence, is not manifestly erroneous or clearly in error.

GOOD AND WORKMANLIKE MANNER
Lancaster also alleges that the trial court erred in not finding that Petcorp breached the Article 5 provision of the written operating agreement, providing that Petcorp shall conduct all of its operations in "a good and workmanlike manner." However, having already found Petcorp free of any negligence, we necessarily must find that the trial court did not err in finding that Petcorp did not breach this provision of the operating agreement.

BREACH OF 90 DAYS NOTICE PROVISION
Lancaster maintains that the trial court erred in failing to find that Petcorp breached the operating agreement by failing to give 90 days notice of its resignation as operator and by threatening to plug and abandon the well without the consent of the other parties.
Paragraph 1 of Article 21 of the operating agreement clearly provides that:
"Operator may resign from its duties and obligations as Operator at any time upon written notice of not less than ninety (90) days given to all other parties."
Article 7 of the operating agreement additionally provides in part that:
"If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible."
It is undisputed that Petcorp did not give 90 days notice of its resignation as operator, nor that Petcorp did not have the consent of all the other parties when it threatened to immediately plug and abandon the well. Petcorp maintains, however, that 90 days notice was not necessary in view of Article 12 and the second paragraph of Article 21 of the written operating agreement. We find that Petcorp relies in error upon these provisions.
Article 12 of the operating agreement is merely a non-consent provision whereby any party may choose not to participate in the continued costs of the well. Article 12 also provides that a non-consenting party shall relinquish his interest to those parties choosing to continue participation in the costs of the well. Paragraph 2 of Article 21 provides that:
"In the event of resignation of Operator, or should Operator (or any successor operator) be adjudicated bankrupt or insolvent, die, be adjudicated mentally incompetent, make an assignment for benefit of creditors, liquidate, dissolve or terminate its corporate existence, or sell its entire interest in the Unit Area, all parties to this Agreement (including the legal representative or successor or Operator) shall select, by majority vote in interest, a new Operator who shall assume the responsibilities and duties and have the rights prescribed for Operator by this Agreement; provided that, should one party to this Agreement then own more than a majority of the working interest within the Unit Area, a concurring vote of one (1) additional party shall be necessary for selection of a new Operator. The retiring Operator shall deliver *777 to its successor all records and information necessary to discharge by the new Operator of its duties and obligations."
Neither of these provisions relieve an operator, who wishes to voluntarily resign, of giving the requisite 90 days notice required by paragraph 1 of Article 21.
Legally, all of the terms of a contract must be read in pari materia so as to give each provision of the contract a meaning and practical consequence. La.C.C. Art. 2050 (1985). If Petcorp's contention was accepted, it would render paragraph 1 of Article 21 meaningless and without purpose. By reading the provision of the operating agreement in pari materia, it is clear that neither the second paragraph of Article 21 nor Article 12 relieves Petcorp of its obligation as operator to give 90 days advance written notice of resignation. Therefore, we are of the opinion that Petcorp's resignation without 90 days advance written notice constituted breach of the written operating agreement.
The evidence in the record makes it abundantly clear that Petcorp did not have the requisite consent of the other mineral interest owners who were parties to the operating agreement when it threatened to plug and abandon the well. Therefore, Petcorp's threat to plug and abandon the well was unreasonable and also constituted breach of the operating agreement.
For these reasons we find the trial court was clearly in error in finding that Petcorp did not breach the written operating agreement. Since we find that Petcorp breached the operating agreement, it now becomes necessary to address the issue of whether or not Lancaster is entitled to damages for that breach.

DAMAGES FOR BREACH OF OPERATING AGREEMENT
At the time of trial Lancaster reserved its claim for reservoir damages (loss of profits) for trial at a later date. Since we have found that the trial court was correct in holding that Petcorp was not negligent and was not responsible for the blowout, we must accordingly find that the trial court did not err in dismissing Lancaster's reserved claim for reservoir damages.
This only leaves for resolution by this Court the claim of Lancaster for damages for breach of contract, which consists of Lancaster's claim for loss of his percentage ownership of mineral interest in the well caused by Petcorp's breach of the operating agreement.
The trial court, in addition to finding that there was no breach of contract on the part of Petcorp (which we reverse), also found that even if a breach occurred, Lancaster failed to establish to a legal certainty the value of his lost mineral interest. With this conclusion, we disagree.
Lancaster claims that as a result of Petcorp's breach, he was forced to relinquish a fifteen percent back-in interest (of his twenty-five percent back-in interest) in the well, in order to retain a new operator within the unreasonable time restrictions placed on him by Petcorp's breach of the operating agreement, leaving him with only a ten percent back-in interest in the well. However, Lancaster did not lose this entire fifteen percent back-in interest. Lancaster originally assigned fifteen percent of his back-in interest to Humble, who in turn handled the negotiation for a new operator (Goldking). Humble did not assign all of Lancaster's fifteen percent interest to Goldking, as the new operator, but rather retained a part of it. Humble eventually returned six and one-quarter percent of this back-in interest to Lancaster. Thus, Lancaster suffered a loss of only eight and three-quarter percent of his back-in interest. We find that Petcorp is liable only for the value of this lost mineral interest.
An interest in an oil well has a recognized value. Fite v. Miller, 192 La. 229, 187 So. 650 (1939); after remand judgment of trial court again reversed and judgment rendered, 196 La. 876, 200 So. 285 (1940). The ultimate productivity of that well is irrelevant; the sale of a mineral interest is the sale of a hope which, under Louisiana law, is valid and has determinable value. La.C.C. Art. 2451. Fite v. Miller, supra.
*778 The value of Lancaster's interest was the subject of much dispute during the trial of this matter. Petcorp's expert witness, I.H. Delatte, who evaluated the worth of Lancaster's back-in interest was of the opinion that Lancaster's interest was of no value because a back-in interest does not share in profits until the cost of the well is paid out, and the production from the Anne H. Hebert No. 1 Well never reached the point of pay out. This analysis required Delatte to look at the ultimate production of the well, a factor which we have already rejected as being irrelevant to the calculation of the value of an interest held in an oil well.
Lancaster presented the expert testimony of an economic geologist, Dr. Wayne Fowler, who had previously prepared an evaluation of the worth of the well in regard to the transfer of Lancaster's interest in the well to a newly-formed corporation, Dofco, at a time subsequent to the blowout and the well's recompletion. Dr. Fowler estimated the value of Lancaster's interest as being worth $41,565.00 for each one percent of interest. Dr. Fowler based his evaluation in large part on the Unitization Order and Study done by the Louisiana Department of Conservation. Dr. Fowler, as noted in his testimony, prepared his evaluation subject to the scrutiny of the federal regulatory bodies overseeing the transfer of stocks and interests in corporations. According to Dr. Fowler, his estimation of the value of Lancaster's interest reflected the fair market value of that interest.
Dr. Fowler's valuation was reinforced by the testimony of Mr. W.S. Dalton, an independent investor, who purchased an interest in Dofco. Mr. Dalton testified that he relied upon the valuation of Fowler and was even of the opinion that Fowler's estimate was conservative.
We therefore find that Fowler's valuation of Lancaster's mineral interests to be the best estimate of its worth. Thus, we find that the eight and three-quarter percent back-in interest which Lancaster lost to be worth $41,565.00 per one percent interest or a total value of $363,693.75 for Lancaster's lost eight and three-quarter percent interest. For these reasons, judgment will be rendered in favor of Lancaster and against Petcorp for damages in the sum of $363,693.77, together with legal interest thereon from date of judicial demand, until paid.

ATTORNEY'S FEES[1]
Lancaster also alleges that he should be entitled to attorney's fees because Petcorp's breach of the operating agreement was in bad faith, motivated only by Petcorp's self-interest and clearly in disregard of the non-operating parties' rights. Lancaster relies upon old La.C.C. Articles 1930 and 1934,[2] and upon the opinion of Smallpage v. Wagner & Wagner, 84 So.2d 863 (La.App.Orl.Cir.1956).
*779 We are, however, unable to subscribe to this theory, in light of the Supreme Court's recent holding regarding attorney's fees.
"It is well recognized in the jurisprudence of this Court that as a general rule attorney's fees are not allowed except where authorized by statute or contract. Hernandez v. Harson, 237 La. 389, 111 So.2d 320. Attorney's fees are not allowable in an action for breach of contract unless there is a specific provision therefor in the contract. Morein v. G.J. Deville Lumber Co., La.App., 215 So.2d 208." Maloney v. Oak Builders, Inc., 256 La. 85, 235 So.2d 386, at page 390 (1970).
Review of the jurisprudence regarding the award of attorney's fees when a bad faith breach of contract occurs reveals that there is little support for Lancaster's contention. The Second Circuit has expressly overruled its prior holdings allowing such awards of attorney's fees for bad faith breaches of contracts even in the absence of statutory or contractual provisions. Lloyd v. Merit Loan Company of Shreveport, Inc., 253 So.2d 117 (La.App. 2nd Cir. 1971), writ den., 259 La. 1054, 254 So.2d 462 (1971). The Second Circuit in so holding stated that:
"[LSA C.C. Art. 1934] provides for unforeseeable bad faith situations but it does not mention attorney's fees, and therefore does not support defendant's position. In view of the decision set forth herein, the cases of Berry v. Ginsburg [98 So.2d 548] and Raney v. Gillen, supra, [31 So.2d 495], are overruled." Lloyd v. Merit Loan Company of Shreveport, Inc., 253 So.2d 117, at page 120 (La.App. 2nd Cir.1971).
In Rutherford v. Impson, 366 So.2d 944 (La.App. 1st Cir.1978), writ den., 369 So.2d 140 (La.1979), the First Circuit seemingly followed the lead of the Second Circuit by stating:
"The Second Circuit Court of Appeal rejected the identical argument advanced before this Court in Lloyd v. Merit Loan Company of Shreveport, Inc., 253 So.2d 117 (La.App. 2nd Cir.1971), writ denied, 259 La. 1050, 254 So.2d 462 (1971). There the Court expressly overruled Raney v. Gillen, 31 So.2d 495 (La.App. 2nd Cir.1947), and Berry v. Ginsburg, 98 So.2d 548 (La.App. 2nd Cir.1957), cases cited by counsel in support of an award of attorney's fees. The Court held that even if it could be shown that the defendants were in bad faith, this would not entitle the plaintiffs to recover attorney's fees in the action.
We hold, therefore, that plaintiff is not entitled to attorney's fees in an action to specifically enforce an agreement to buy and sell real estate." Rutherford v. Impson, 366 So.2d 944, at page 947 (La. App. 1st Cir.1978).
The only cases that would seemingly support Lancaster's contention are the later First Circuit case of Cobb v. Gallet, 392 So.2d 134 (La.App. 1st Cir.1980), and the Fourth Circuit case of Rye v. Terminix Service Co., Inc., 423 So.2d 754 (La.App. 4th Cir.1982). However, in neither case were any attorney's fees awarded for bad faith breach of contract. We are not bound by the dicta of those courts.
In this instance we will not award attorney's fees for bad faith breach of contract in the absence of a statutory or contractual provision authorizing attorney's fees.
There being no contractual or statutory provision providing for attorney's fees in this case, we find that Lancaster is not entitled to attorney's fees.

EXPERT WITNESS FEES
Lancaster finally argues that the trial court erred in casting him and Humble, in solido, for costs including expert witness fees of $1,500.00. However, because we have reversed the decision of the trial court and have awarded Lancaster damages for breach of contract, we also reverse the trial court's judgment casting Lancaster and Humble for all costs, and now order that all costs of the trial and appeal be taxed against Petcorp.

*780 CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed in part, reversed and set aside insofar as it found no breach of contract and failed to award damages to plaintiff, and reversed insofar as it taxed all costs against Lancaster and Humble, in solido. We affirm the judgment of the trial court finding no negligence on the part of Petcorp and its agents and employees in causing the well blowout, and now render judgment in favor of Lancaster and against Petcorp in the amount of $363,693.75 together with legal interest from date of judicial demand, until paid. All costs of the trial and this appeal, including the expert witness fees, are taxed against Petcorp.
AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.
NOTES
[*] Judge Ronald D. Cox of the Fifteenth Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court.
[1] The issue of quantum of attorney's fees was reserved for trial at a future date but will be considered on appeal, in the interest of judicial economy, to avoid a remand.
[2] Former La.C.C. Articles 1930 and 1934 respectively provided:

"Art. 1930. The obligations of contract [contracts] extending to whatsoever is incident to such contracts, the party who violates them, is liable, as one of the incidents of his obligations, to the payment of the damages, which the other party has sustained by his default."
"Art. 1934. Where the object of the contract is any thing but the payment of money, the damages due to the creditor for its breach are the amount of the loss he has sustained, and the profit of which he has been deprived, under the following exceptions and modifications:
1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By bad faith in this and the next rule, is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.
2. When the inexecution of the contract has proceeded from fraud or bad faith, the debtor shall not only be liable to such damages as were, or might have been foreseen at the time of making the contract, but also to such as are the immediate and direct consequence of the breach of that contract; but even when there is fraud, the damages can not exceed this ..."