GUIDRY, Judge.
In this products liability suit, plaintiffs, the survivors of Eldon Frederick, appeal a jury verdict and subsequent judgment dismissing with prejudice their claims against defendants for damages they sustained when their decedent was rolled over by a school bus.
In June 1984, Eldon Frederick was employed by the Avoyelles Parish School Board as janitor and bus driver for the Career Development Center (CDC) in Cot-tonport, Louisiana. On the morning of June 5, 1984, Keith Morrow, the principal of the CDC, instructed Frederick to conduct a pre-inspection of the CDC’s 1977 General Motors-Thomas Built school bus, in preparation for an upcoming annual State Police inspection.
It is hypothesized that during that inspection, Frederick noticed a spot of oil on the garage floor and moved the bus outside to check for a possible oil leak. Presumably, Frederick crawled under the bus with the engine running to check for the suspected leak and while Frederick was underneath the bus, somewhere between the left front and left rear wheels, the bus moved forward and the left rear tires rolled over him.[1] No one witnessed the accident. The decedent was found unconscious, bleeding profusely from both his nose and mouth and barely breathing. His body, stomach down on the pavement with his head turned to the left, was found underneath the bus and just behind the bus’ left rear wheels. The prints of the bus’ rear tires were visible across his clothes. The victim died before professional medical help could reach him. The bus was found with its hood up, the engine still running, the gear shift lever in the “Park” position and its front end embedded about three to four feet into a chain link fence surrounding the area.
Plaintiffs, Marice Frederick, the widow of Elton Frederick, and Peggy Frey and Connie Phillips, the surviving children, filed suit against General Motors (GM), Thomas Built Buses, Incorporated (Thomas), Johnson Chevrolet-Gldsmobile, Incorporated (Johnson), and Ideal Chevrolet, Incorporated, (Ideal) alleging that the bus was defective in that its transmission could be moved from “Park” into the “Drive” position from beneath the bus by manual manipulation of the gear shift linkage. In sum, plaintiffs alleged that the bus was delivered with a defective park-lock mechanism.
First Horizon Insurance Company, the worker’s compensation insurer of the Avo-yelles Parish School Board, intervened in the suit seeking to recover worker’s compensation and death benefits paid to plaintiffs in connection with the death of Frederick. Before the case proceeded to trial, plaintiffs’ suit against Thomas and Ideal was dismissed.
The case was tried to a jury which rendered a unanimous verdict in response to Special Interrogatories as follows:
“ ‘1. When the bus left the control of General Motors after its manufacture, did it contain a condition which was unreasonably dangerous for normal use?’
ANSWER: Yes_ No X
‘4. Was there any fault or negligence on the part of Johnson Chevrolet-Oldsmobile, Inc., which was a legal cause of the accident?’
ANSWER: Yes _ No X ”
A judgment, in accordance with the jury verdict, was subsequently rendered. Plaintiffs appealed.
On appeal plaintiffs contend that they met their burden of proof, by a preponderance of the evidence, that the bus had a defect at the time of manufacture which made the bus unreasonably dangerous in *759 normal use and which caused the death of Eldon Frederick. They urge that the jury’s contrary finding is manifestly erroneous.
The first person to make any sort of inspection of the bus after the accident was the school principal, Keith Morrow. Morrow was notified of the accident by Layton Tassin, another CDC janitor, who first discovered the accident. Morrow hurried to the accident scene. As the engine was still running, Morrow entered the bus to shut off the motor. He testified that he found the gear shift lever in the “Park” position and when he stopped the engine, the bus, which was jammed into the fence, lurched backwards.
The bus was also perfunctorily checked that day by two deputies from the Avo-yelles Parish Sheriffs Department, who investigated the accident. One of those deputies, Darwin LaPrairie, was deceased at the time of the trial. However, his report, by agreement of counsel, was read into evidence at trial. That report reads in pertinent part as follows:
“Upon arrival at the CDC Center, time being 9:30 a.m., I seen a white male lying sideways behind the rear wheels of a school bus. Body being that of Mr. Eldon ‘Wheat’ Frederick, who was a janitor at the CDC ... Mr. Frederick was dead, caused by the rear wheels of the school bus that had rolled over on him. The above mentioned school bus was owned by the Avoyelles Parish School Board, being a 1977 General Motors ... mileage 41,681. The school bus transmission lever was in park position, only the ignition key had been turned off. I, Darwin LaPrairie, then inspected the lower shift linkage which appeared to shift very easily and that shift plate in park position had some wear. Reference to dog in park position had approximately Vs to ¾6 inch radius, however, it was well lubricated.”
The other deputy, Marcel Galland, testified that he also found the gear shift lever in the “Park” position. He shifted the bus through the range of gears and found that the bus’ transmission functioned properly. Deputy Galland admitted that he made no effort to check whether or not it was possible to move the transmission out of “Park” by simply pulling straight down on the shift lever without lifting it.
In attempting to prove their theory of the case (that the bus had a defect in the park-lock mechanism which allowed the transmission to be shifted from “Park” into “Drive” from beneath the bus by both deliberate manipulation of the linkage attached to the park-lock mechanism and by inadvertently contacting the linkage), plaintiffs subpoenaed all maintenance and inspection records connected with the bus, called mechanics who had worked on the bus and employed an expert to inspect the suspect park-lock mechanism.
The repair and inspection records revealed no problem with or repair to the gear-shift linkage prior to the accident. On the day following the accident, certain repairs were made to the bus but none were necessary on the shifting mechanism. The State Police inspection done thirteen days after the accident noted no shifting or transmission problems. The only record of any repair to the transmission or shift linkage was on an invoice dated November 19, 1984, some five months after the accident. The mechanic at Johnson Chevrolet who made the repairs, Craig Gauthier, testified that the bus was brought in with complaints that it was hard to shift. Gauthier discovered an accumulation of rust in the shift lever column. He corrected the problem by lubricating the column with a special rust lubricant and working the shift lever until it moved freely.
The first evidence of any shift linkage problem came in July of 1986, more than two years post accident. Dennis Johnson, an independant mechanic, was hired by Keith Morrow to work on the bus. Johnson testified that upon inspecting the bus, he found that he could move the shift lever from the “Park” to the “Drive” position by simply pulling straight down on the shift lever. He also testified that he could manipulate the shift linkage from underneath the bus. Johnson stated that he disassembled the steering column and replaced the mast jacket and three unidentified plastic *760 parts, but the repairs failed to correct the problem. He also stated that upon further inspection, the tang on the “park plate” appeared to be worn (see Appendix 1). However, no attempt to repair, adjust or change the part was undertaken. On cross-examination, the defendants established that Johnson’s testimony at trial contradicted the testimony he had given in an earlier deposition regarding the operation of the shift lever, both before and after his replacing the mast jacket and plastic items. In deposition, Johnson stated that the shift worked normally.
The only other person called by plaintiffs to testify in reference to the mechanical condition of the bus was George Jefferson Green, Jr., who was accepted by the court as an expert in mechanical engineering. Green examined the bus twice: once on June 30, 1986, and again on August 2, 1987. Green hypothesized that the victim was under the bus making an inspection, when he hit or bumped the shift lever causing the bus to jump out of park into gear and roll over him. Green opined that the shift mechanism which was supposed to lock the bus in “Park” was not working and/or was defective. Under cross-examination, Green admitted that following his first inspection of the bus, he related this hypothesized malfunction or defect to the broken plastic pieces near the top of the shift column which were replaced by Johnson. It was not until after Green read the deposition of James L. Tomlinson, GM’s expert in automotive engineering, that Green discovered the park-lock mechanism was located at the bottom end of the shift column, under the floor board of the bus. After making this discovery, Green attacked the design of the park-lock mechanism opining that the support lever or shift gate should have had a slot in it in the “Park” position as well as in the “Drive” position. Green was also of the opinion that the standard design of the tang on the lower shift lever was superior to the optional design (both designs are shown on GM diagram 3869822, attached as Appendix 1); the bus was equipped with the optional design; and, the use of the optional design tang on the bus made it unreasonably dangerous.
Green’s testimony was completely contradicted by the testimony of James L. Tomlinson, GM’s expert in automotive engineering. Using a mock-up of the bus involved in the accident, Tomlinson demonstrated to the court exactly how the shift-lock mechanism worked. He testified and demonstrated that it was unlikely that the transmission was moved from “Park” into “Drive” by manual manipulation from underneath the bus because in order to reach the shift rod, one would have to reach around the exhaust pipe just a few inches past where it joins the manifold. Tomlin-son testified that tests he conducted showed the exhaust pipe becomes too hot to touch after the engine runs for approximately one minute.[2],
Tomlinson testified that when he first inspected the bus on August 1, 1985, some eleven months before Green, his examination revealed no problem with either the gear shift lever or the park-lock mechanism. However, that was not the case when he again inspected the bus on June 29, 1987, some three years post accident. At that time, the gear shift linkage did malfunction. Tomlinson attributed the malfunction to excessive wear on the lower shift lever and the support lever (shift gate), the two parts which meshed together to form the shift-lock mechanism. His second inspection also revealed the shift linkage was not adjusted to GM specifications and that the linkage showed several adjustments had been made. Tomlinson was of the opinion that the maladjustment of the linkage was the cause of the excessive wear noted by Green in August 1987, and that the maladjustment probably was done by Dennis Johnson when he replaced the mast jacket and plastic parts in July of 1986.
Concerning the standard tang design versus the alternate tang design theory es *761 poused by Green, Tomlinson related that the “optional” on the GM drawing referred to an alternate method of manufacturing a tang with the exact same measurements as the “standard” diagram. The confusion in the two diagrams came about only because the standard design diagram pictured the tang facing the right, while the optional drawing showed the tang pointing downward (see Appendix 1). Finally, Tomlinson stated that the basic design of the park-lock mechanism had not changed since GM began manufacturing “automatic” transmissions and that there were probably millions of vehicles on the road with this same type transmission.
All of the witnesses with mechanical backgrounds who testified, agreed that Johnson in no way contributed to the accident.
Two key cases in the area of products liability in Louisiana are Weber v. Fidelity and Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754 (1971), and Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986).[3] In Weber, supra, the Louisiana Supreme Court stated:
“A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiffs injuries were caused by reason of the defect.
[[Image here]]
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.”
The Halphen court explained further:
“A product is unreasonably dangerous in construction or composition if at the time it leaves the control of its manufacturer it contains an unintended abnormality or condition which makes the product more dangerous than it was designed to be.... A manufacturer or supplier who sells a product with a construction or composition flaw is subject to liability without proof that there was any negligence on its part in creating or failing to discover the flaw. Evidence of what knowledge was available to the manufacturer has no relevance in such cases because the product, by definition, failed to conform to the manufacturer’s own standards....”
Hence, plaintiffs, in order to recover, had to prove by a preponderance of the evidence that when the bus left the control of General Motors, it contained a defect in design or manufacture which made it unreasonably dangerous in normal use and that Eldon Frederick’s death resulted from such condition.
In reviewing the case, we are guided by the principles of review set out by the Louisiana Supreme Court and concisely articulated by a panel of this court in Lancaster v. Petroleum Corporation of Delaware, 491 So.2d 768 (La.App. 3rd Cir.1986):
“In Louisiana, jurisdiction of the appellate courts extends to both facts and law. Louisiana Constitution of 1974, Art. V, § 10(B). In regard to appellate review of factual determinations made by the trial court, it is clear that:
‘When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must *762 give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.’ Canter v. Koehring Company, 283 So.2d 716, at page 724 (La.1973).
However, the Louisiana Supreme Court has further stated that:
‘[t]he appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding in the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong (manifestly erroneous).’ Arceneaux v. Domingue, 365 So.2d 1330, at page 1333 (La.1978).”
As this case was tried to a jury and their verdict depended to a large extent on the testimony of the expert witnesses, we take note of the following:
“Where the testimony of expert witnesses differs, it is largely a matter of fact for the trier of fact to determine the most credible evidence, and a finding of fact in this regard will not be overturned unless manifest error appears in the record. Green v. State, Southwest Louisiana Charity Hospital, 309 So.2d 706 (La.App. 3rd Cir.1975), writ denied, 313 So.2d 601 (La.1975); St. Pierre v. Gabel, 351 So.2d 821 (La.App. 1st Cir.1977), and State v. Wilco, 393 So.2d 885 (La.App. 4th Cir.1981).”
Agricultural Equipment Co., Inc. v. Rozas, 488 So.2d 241 (La.App. 3rd Cir.1986), at 244, and
“... When faced with testimony that is conflicting, the jury has the duty of determining what facts have been proved and what facts have not been proved. The jury must determine the weight that they shall attach to the testimony of the various witnesses who testified. Fisk v. Chamblee, 430 So.2d 1332 (La.App. 3rd Cir.1983), writ den., 439 So.2d 1076 (La.1983). The jury’s evaluation of credibility and inferences of fact should not be disturbed even though the appellate court may differ with the jury’s conclusions. Gibson v. Winn Dixie Louisiana, Inc., 426 So.2d 731 (La.App. 3rd Cir.1983).”
Morvant v. Kent’s Nursery, Inc., 487 So.2d 449 (La.App. 3rd Cir.1986), at 451, writ denied, 488 So.2d 1010 (La.1986).
In the present case, the jury apparently- found the testimony of Tomlinson, GM’s expert, credible and rejected the theory espoused by Green. Our review of this same testimony, along with our review of the testimony of the lay witnesses, fails to convince us that the jury was clearly wrong when it concluded that plaintiffs failed to prove, by a preponderance of the evidence, that when the bus in question left the control of General Motors, it contained a condition which rendered it unreasonably dangerous in normal use. Likewise, we find no error in the jury’s conclusion that Johnson was not negligent.
In sum, we find the jury’s conclusions to be well supported by both the testimony and other evidence introduced at trial. For these reasons, the judgment of the trial court is affirmed. Costs of this appeal are taxed to appellants.
AFFIRMED.
*763 [[Image here]]

. Keith Morrow testified that following the accident a spot of oil was discovered on the garage floor in the area where the bus was usually parked. On the basis of this evidence, plaintiffs hypothesize that, at the time of the accident, the decedent was underneath the bus checking for an oil leak.

. Neither Green nor Tomlinson were asked or sought to explain how, if the bus was shifted out of “Park" into "Drive” by manual manipulation from underneath the bus, the shift lever was found in the “Park” position immediately following the accident.

. Some of the principles established in Halphen were legislatively overruled by the Louisiana Products Liability Act, Acts 1988, No. 64. The effective date of this act was September 1, 1988 and has no bearing on this case.