# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-31072

United States Court of Appeals
Fifth Circuit

**FILED**

September 4, 2015

Lyle W. Cayce
Clerk

MICHAEL CASH,

      Plaintiff

v.

LIBERTY INSURANCE UNDERWRITERS, INCORPORATED,

      Defendant - Appellant-Cross Appellee

v.

MAX WELDERS, INCORPORATED,

      Defendant - Appellee-Cross Appellant

Appeals from the United States District Court
for the Western District of Louisiana
USDC No. 6:04-CV-1648

Before STEWART, Chief Judge, and BARKSDALE and PRADO, Circuit Judges.

PER CURIAM:*

      This case involves a dispute arising over the interpretation of a marine insurance policy. The district court ruled that the policy at issue provided

---

      * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## No. 14-31072

coverage and ordered Defendant-Appellant insurance company to reimburse Defendant-Appellee insured for the full settlement amount resulting from the underlying suit, in addition to attorney's fees, costs and interest. All other pending claims were dismissed. For the following reasons, we reverse in part.

## I. Facts & Procedural History

In 2003, Union Oil Company of California ("Unocal") retained Shaw Global Energy Services, Inc. ("Shaw") to provide painting and sandblasting on a fixed platform located on the outer continental shelf off the coast of Louisiana. The Shaw employees were housed in an adjacent platform to the fixed platform where they provided labor for Unocal. They were transported from the housing platform to Unocal's platform on the M/V LYTAL ANDRE, a vessel owned by Lytal Enterprises ("Lytal").[1]

On August 11, 2003, the underlying incident giving rise to this insurance coverage dispute occurred when Michael Cash ("Cash"),[2] an employee of Shaw, sustained severe injuries while being transferred by crane from a platform to a supply vessel. The crane operator[3] who was transporting Cash during the time of the incident was an employee of Max Welders, Inc. ("Max Welders"). On August 6, 2004, Cash filed suit in federal district court against, *inter alia*, Max Welders, Max Welders' primary insurer, Lexington Insurance Company ("Lexington"), and Max Welders' marine excess insurer, Liberty Insurance Underwriters, Inc. ("Liberty").

During the time of the incident, Liberty had issued to Max Welders a "Marine Excess ('Bumbershoot') Liability Policy" ("Bumbershoot Policy"). The policy was effective June 1, 2003 through June 1, 2004. The general purpose

---

[1] Unocal regularly retained Lytal to transport Unocal contractors, including employees of Shaw, to Unocal's various platforms located in the Gulf of Mexico.

[2] Michael Cash died in an automobile accident on September 5, 2010. His estate was substituted as a party in the underlying proceedings in April 2011.

[3] Glenn Ellerbee.

No. 14-31072

of the Bumbershoot Policy was to provide certain specified coverage in excess of Max Welders' other primary insurance policies.[4]     Specifically, the Bumbershoot Policy provided in part:

A. Coverage

The Policy shall indemnify the Insured with respect to the operations listed in Item 7 of the Declarations[5] for the following . . .

1.   All Protection and Indemnity risks covered by the underlying Protection and Indemnity Insurance . . . .

2.   General average, marine collision liabilities, salvage, salvage charges and related sue and labor arising from any cause whatsoever.

3.   All other sums which Insured shall become legally liable to pay as damages on account of:

   a. personal injuries, including death at any time resulting therefrom, or
   b. property damage

   caused by or arising out of each occurrence happening anywhere in the world.

The exclusions section of the policy provided the following:

A. This insurance does not apply to:

. . .

11.     Any liability for, or any loss, damage, injury or expense caused by, resulting from or incurred by reason of:

---

[4] At the time of the incident, Max Welders carried comprehensive general liability insurance, automobile insurance, employers' liability insurance, maritime employers' liability insurance, and protection and indemnity insurance, in addition to the marine excess liability policy issued by Liberty.

[5] Item 7 of the Declarations reads: "Description of Insured Operations: *Oilfield Offshore Contractor*."

No. 14-31072

. . .

    d. any liability or expense arising out of the ownership, use or operation of . . . platforms . . . but this exclusion shall not apply to craft serving the foregoing such as crew, supply, or utility boats, tenders, barges or tugs.

In June 2007, Max Welders submitted notice to Liberty that Cash's claim might exceed the limits of its primary liability insurance policy. On February 10, 2009, Liberty advised Max Welders it was declining coverage for Cash's injuries, on the basis of the exclusion involving the use of platforms in section III.A.11.(d) (referred to hereinafter as "the Platform Exclusion"). Liberty sent a Notice of Declination of Coverage to Max Welders, stating that the incident involving Cash fell within the parameters of the Platform Exclusion since he sustained direct or indirect bodily injury while using or operating the platform.

Shortly thereafter in June 2009, while proceedings were pending in district court, Max Welders brought a cross-claim against Liberty seeking judgment that Liberty: (1) waived any right to contest coverage and/or raise exclusions under the Bumbershoot Policy; (2) violated duties owed to Max Welders pursuant to La. R.S. 22:1892 and La. R.S. 22:1973; (3) "breached its agreement to provide insurance to Max Welders, Inc. and breached its duties in bad faith"; and (4) violated the Louisiana Unfair Trade Practices Act. Through an amended cross-claim, Max Welders added a detrimental reliance claim against Liberty and further sought judgment that no exclusions in the Bumbershoot Policy applied to this matter.

In September 2009, Max Welders entered into a settlement agreement with Cash. In accordance with the settlement agreement, Lexington agreed to pay Cash the policy limit amount of $1,000,000, Max Welders agreed to pay

No. 14-31072

Cash $400,000, and other named defendants in the underlying suit agreed to pay Cash a total of $50,000.

In May 2010, upon the joint motion of the parties, all claims in the proceedings were dismissed except: (1) Cash's claim against Max Welders;[6] and (2) Max Welders' cross-claim against Liberty seeking coverage and aspects relating thereto. The parties agreed to a trial on the briefs for the remaining claims. The primary issue in dispute was whether the Platform Exclusion applied thereby precluding coverage, and more specifically, whether the term "use" included the activities of Max Welders' employees—including the crane operator's transporting of Cash—on the Unocal platform.

The district court issued a Ruling in July 2012 wherein it stated that the Bumbershoot Policy's language was ambiguous because the term "use" was subject to more than one meaning. The district court reasoned that there was uncertainty as to how broadly the Platform Exclusion should be read within the context of the entire policy and its declared purpose. On those grounds, the district court permitted the submission of extrinsic evidence by both parties, which included the deposition testimony of several insurance underwriters who had experience with bumbershoot policies and the marine insurance industry. The district court then concluded that the parties' intent when entering into the Bumbershoot Policy was to provide Max Welders with insurance coverage for liability arising out of the operations it conducted as an offshore oilfield contractor, which clearly included activities on platforms. In the district court's view, to apply the broadest definition of "use" and "operation" as urged by Liberty would lead to an absurd result, because virtually no coverage would be available for Max Welders' work activities.

---

[6] The parties agreed that Max Welders would only be liable to Cash to the extent of collectible insurance coverage provided by Liberty.

No. 14-31072

Employing the *Black's Law Dictionary*'s definition of "use," *i.e.*, the "employment of a thing for the purpose for which it is adapted,"[7] the district court found that Max Welders' incidental use of the platform—to transfer a service contractor from the platform to a vessel—would not trigger the application of the Platform Exclusion because the platform's true intended use was for the purpose of extracting energy. Thus, the district court ruled, Liberty owed coverage to Max Welders pursuant to the Bumbershoot Policy for liability arising out of the incident involving Cash in 2003.

Liberty filed a motion for "new trial/reconsideration" and an alternative motion to certify the district court's ruling for immediate appeal which were both subsequently denied. Max Welders also filed a motion for reconsideration, a motion for leave to file a supplemental trial brief, and a motion for post-ruling relief. The district court denied the motions for reconsideration and for leave to file supplemental briefing but granted the motion for post-ruling relief and instructed Max Welders to file a motion to fix attorney's fees, which was referred to the Magistrate Judge ("MJ") for a Report and Recommendation ("R&R").

In December 2013, the MJ issued his R&R and recommended that Max Welders be awarded $173,557.75 in attorney's fees and $18,699.60 in expenses, for a total award of $192,257.35. The district court declined to adopt the MJ's R&R and remanded the matter because Max Welders, in its motion to fix attorney's fees, had specifically requested fees incurred in its defense against Cash's claims but not those incurred in pursuing coverage. *See, e.g.*, *Steptore v. Masco Constr. Co.*, 643 So. 2d 1213, 1218 (La. 1994). On remand, the MJ recommended an adjusted award of $3,187.50 in attorney's fees and $1,660.87

---

[7] BLACK'S LAW DICTIONARY (9th ed. 2009).

No. 14-31072

in expenses, for a total of $4,848.37. The district court adopted the R&R on remand.

In September 2014, the district court entered a final judgment incorporating the findings of the July 2012 ruling and ordering Liberty to reimburse Max Welders for the total amount of the $400,000 settlement payment it had issued to Cash. The judgment awarded Max Welders attorney's fees in the amount of $4,848.37, pursuant to the terms of the Bumbershoot Policy, and interest and costs accruing from the date Max Welders issued the $400,000 settlement payment to Cash. Additionally, the judgment dismissed Max Welders' remaining claims against Liberty because Max Welders failed to brief those claims.[8]

Liberty appeals the district court's grant of coverage to Max Welders, including the district court's final judgment of September 1, 2014, and the two district court rulings that form the basis of that judgment dated July 25, 2012 and August 13, 2013. Max Welders cross-appeals the district court's award of attorney's fees and also argues on appeal that Liberty's 20-month delay in declining coverage amounted to waiver of its defense to coverage. We address each of the parties' arguments in turn.

## II.    Standard of Review

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *Lehmann v. GE Glob. Ins. Holding Corp.*, 524 F.3d 621, 624 (5th Cir. 2008) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 52(a). We also review a district court's interpretation of an insurance policy de novo. *See In re TransTexas Gas Corp.*, 597 F.3d 298, 309 (5th Cir. 2010).

---

[8] This part of the judgment is not at issue on appeal.

No. 14-31072

## III.   Analysis

*A. Coverage Under the Bumbershoot Policy*

The parties do not dispute that Louisiana law applies in this case.  *See Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 886–87 (5th Cir. 1991).  "To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court."  *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 517 n.2 (5th Cir. 2010) (citations omitted).  "In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case."  *Id.*

Pursuant to Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts . . . ."  *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).  This court's role in interpreting insurance contracts is "to ascertain the common intent of the parties to the contract," *id.* at 580, because their intent, "as reflected by the words of the policy, determine[s] the extent of coverage." *Reynolds v. Select Props., Ltd.*, 634 So. 2d 1180, 1183 (La. 1994).  "The words of a contract must be given their generally prevailing meaning [and] [w]ords of art and technical terms must be given their technical meaning when the contract involves a technical matter."  La. Civ. Code art. 2047.   Further, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation" is required to determine the parties' intent.  La. Civ. Code art. 2046.

"In Louisiana, '[p]arol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent.'" *Total E & P USA, Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 435 (5th Cir. 2013) (alteration in original) (citation omitted).  "A contract is considered ambiguous on the issue

8

of intent when it lacks a provision bearing on that issue or when the language used in the contract is uncertain or is fairly susceptible to more than one interpretation." *Id.* (internal quotation marks omitted).  However, "if the language of [a policy] exclusion is subject to two or more reasonable interpretations, the interpretation which favors coverage must be applied." *Elliott v. Cont'l Cas. Co.*, 949 So. 2d 1247, 1254 (La. 2007) (citation omitted).

"[I]t is the burden of the insured to prove the incident falls within the policy's terms," and "the insurer bears the burden of proving the applicability of an exclusionary clause within a policy." *Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 124 (La. 2000).  If the insurer "cannot unambiguously show an exclusion applies, the Policy must be construed in favor of coverage." *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 880 (5th Cir. 2009) (citation omitted).

Liberty argues that the term "use" as provided in the Platform Exclusion is unambiguous and excludes coverage.  We agree.

The district court reached the conclusion that the term "use" in the Bumbershoot Policy was ambiguous after it considered and distinguished two cases which had nearly identical language to Platform Exclusion at issue herein.  Upon closer review of those two cases, we find them to be dispositive. In *Janex Oil Co., Inc. v. Hanover Compressor Co.*, a suit was filed alleging that an employee of the insured negligently failed to properly supervise activities on a platform, which ultimately led to the occurrence of a fire and explosion on the platform. 694 So. 2d 415, 416 (La. App. 4 Cir. 2/19/97).  The parties had entered into a bumbershoot insurance policy contract with an exclusion containing nearly identical language to the one at issue herein.  *Id.* The exclusion stated that the insurer would not cover liability or expense arising "from ownership, use or operation of drilling rigs, drilling barges, drilling tenders, platforms [and/or] lose lines . . . ." *Id.* The Louisiana Fourth Circuit Court of Appeals agreed with the insurer's argument in that case that "the

purpose of [the] exclusion was to limit coverage to vessels while excluding drilling platforms." *Id.* (stating that "[t]he actions of [the insured] were involved in the operation of the platform and under any reasonable reading of the policy language [arose] out of the operation of the platform/drilling rig").

In *Underwriters at Lloyd's London v. OSCA, Inc.*, an employee of the insured was attempting to set a bridge plug in a well located on a platform when a blowout occurred causing damages. Nos. 03-21021, 03-20817, 2006 WL 941794, at *2 (5th Cir. Apr. 12, 2006) (per curiam). Again, the parties had entered into a bumbershoot insurance policy contract with an exclusion containing nearly identical language to the one herein. *Id.* at *22. The exclusion stated that the insurer was excluded from liability "arising from: ownership, use, or operation of drilling rigs, drilling barges, drilling tenders, platforms, flow lines, gathering stations, and or pipelines . . ." *Id.* This court held that the exclusion applied and barred recovery. *Id.* at *23 (declining to view the platform as nothing more than a location for the well and therefore incidental to where the actual damage occurred).

As the court did in *Janex*, and as this court did in *Lloyd's*, we find herein that the policy exclusion at issue—containing essentially identical language to the policy exclusions in those cases—applies in this case to exclude coverage. The term "use" as contained in the Platform Exclusion is not ambiguous. *See Elliott*, 949 So. 2d at 1254. It is clear from the plain language of the policy here, as it was to the court in *Janex*, that the parties intended to exclude platforms from coverage. *See Cadwallader*, 848 So. 2d at 580. If the parties had intended for the use or operation of the platforms to be covered under the policy, they could have drafted the contractual language that way or omitted the term "platform" from the exclusions section, but they did not.

Moreover, it is clear from the record that the actions of Max Welders in this case—moving Shaw employees between the platform and the vessels to

perform their job duties—clearly involved the use of the platform. *See Janex*, 694 So. 2d at 416. Further, similar to the court's observation in *Lloyd's*, the platform as it was used by Max Welders was not merely a location for the crane and therefore incidental to the damage that occurred there. *See Lloyd's London*, 2006 WL 941794, at *23. The platform was being used by the crane operator to transport Shaw employees in connection with the work they were doing for Unocal. Although it may be true, as the district court concluded, that one intended use of a platform is to extract energy, it is also possible that platforms can have more than one use in connection with that intended purpose—as was the case here.

In conclusion, we hold that the district court erred in finding that Liberty owed coverage to Max Welders under the Bumbershoot Policy.[9]

*B. Attorney's Fees*

On cross-appeal, Max Welders argues that not only was it entitled to attorney's fees and costs associated with its defense against Cash's claims, but that it was also entitled to attorney's fees and costs incurred in its pursuit of coverage from Liberty.

In light of our holding reversing the trial court's ruling that Liberty owed coverage to Max Welders under the Bumbershoot policy, we also reverse the district court's award of attorney's fees, costs and interest to Max Welders. As such, we decline to address Max Welders' argument that it is entitled to additional attorney's fees and costs incurred in the pursuit of coverage from Liberty.

---

[9] In light of this holding, it is not necessary that we address Liberty's third argument with regard to whether the district court erred in assigning relevance as to whether the crane was a component part of the platform. For this same reason, we also decline to discuss Max Welders' waiver argument regarding Liberty's 20-month delay in declining coverage.

No. 14-31072

## IV.  Conclusion

For the foregoing reasons, the portion of the district court's final judgment[10] ordering Liberty to provide coverage under the Bumbershoot Policy to Max Welders, and ordering Liberty to pay to Max Welders reimbursement of $400,000, attorney's fees, costs and interest, is REVERSED.  All other aspects of the district court's judgment are AFFIRMED.

---

[10] Dated September 1, 2014, including any portions of the Rulings dated July 25, 2012 and August 13, 2013, to the extent that they were relied upon or incorporated into the part of the district court's September 1, 2014 final judgment that is reversed herein.