# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31189

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2020

Lyle W. Cayce
Clerk

WHITNEY BANK,

Plaintiff - Appellant Cross-Appellee

v.

SMI COMPANIES GLOBAL, INCORPORATED; VAUGHN S. LANE,

Defendants - Appellees Cross-Appellants

Appeals from the United States District Court
for the Western District of Louisiana

Before SMITH, DENNIS, and HAYNES, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

Whitney Bank, a Mississippi corporation, sued SMI Companies Global, Inc., a Louisiana corporation, and its president and loan guarantor, Vaughn S. Lane, a Louisiana resident, to collect under two loan agreements upon which SMI allegedly defaulted. SMI filed several counterclaims against Whitney for breaches of the loan agreements, negligent misrepresentation, and tortious interference with its business relations. After a bench trial, the magistrate judge[1] required SMI to repay the amount it owed on the first loan plus interest,

---

[1] The parties consented to the case being tried before a magistrate judge, pursuant to 28 U.S.C. § 636(c).

No. 18-31189

totaling more than $1.2 million, but relieved SMI of its obligation to repay the outstanding principal and interest on the second loan.  The magistrate judge also ruled in favor of SMI on all of its counterclaims and ordered that Whitney pay SMI $3.5 million in damages on those claims.  For the reasons that follow, we AFFIRM in part, REVERSE in part, and REMAND.

## I. FACTS AND PROCEDURAL BACKGROUND

SMI Companies Global, Inc. (SMI) was an equipment fabricator in the oil and gas industry.  In December 2012, SMI applied for a loan from Whitney Bank (Whitney) to fund its general business operations.  Whitney and SMI initially agreed to a $1 million revolving line of credit (Loan 1), secured by SMI's accounts receivable and with SMI's president Vaughn Lane as guarantor.[2]  The parties renewed the agreement in 2014 and 2015, and increased the maximum credit amount to $1.5 million.  According to the agreement, SMI could borrow up to $1.5 million depending on what its accounts receivable supported, its borrowing base,[3] as evidenced through certificates that SMI was required to submit to Whitney.  Loan 1 matured on July 31, 2016, when SMI was required to "pay [the] loan in one payment of all outstanding principal plus all accrued unpaid interest."

In March 2015, Halliburton Corporation offered SMI a $2 million contract to construct eight steel acid tanks.  At the time, business at SMI was slow due to the decrease in oil prices, which caused an industry-wide economic downturn.  Moreover, the terms of the project were onerous, especially for a

---

[2] Whitney and SMI executed three documents pertaining to this line of credit: (1) a business loan agreement; (2) a promissory note; (3) and a commercial security agreement. Additionally, Lane executed a commercial guaranty, and a guarantor acknowledgement. Collectively, these documents are referred to in this opinion as Loan 1.

[3] According to trial testimony, a borrowing base certificate is an instrument that tells the bank what the borrowing company has in receivables and therefore the amount that the company should be permitted to borrow from the bank.

No. 18-31189

company experiencing cash-flow problems—most significant was the withholding of payment until all eight vessels were delivered. Eager to accept an opportunity for new business amid a market downturn but unable to do so without outside financing, SMI turned to Whitney.

Whitney agreed to extend a $900,000 line of credit (Loan 2)[4] for the Halliburton job. Under the terms of Loan 2, the loan matured on April 3, 2016, and, like Loan 1, it was secured by SMI's accounts receivable, along with SMI's other property, and was guaranteed by Lane. SMI argues that Loan 2 was intended to be secured solely by the Halliburton receivables as collateral and segregated from SMI's other accounts receivable securing Loan 1. However, the text of the contract does not reflect such an agreement.

Before the parties executed Loan 2, SMI relayed all information regarding the Halliburton project to a commercial loan officer at Whitney, including the payment schedule. Whitney was aware of SMI's poor financial condition, knew that SMI could not complete the Halliburton project without the loan, and knew that SMI could not repay the loan until the Halliburton project was complete.

The Halliburton job encountered delays, and actual work on the tanks did not begin until March 2016, a month before Loan 2 matured. In April 2016, the parties extended Loan 2's maturity date to July 3, 2016, though both parties knew that the project could not be completed by that date. In late May 2016, Whitney's loan officer e-mailed Lane stating he would request that Whitney combine Loans 1 and 2 and set a maturity date of December 2016 to "continue the accommodation with regards to Halliburton." No agreement was

---

[4] Whitney and SMI executed three documents pertaining to this line of credit: (1) a business loan agreement; (2) a promissory note; (3) and a commercial security agreement. Collectively, these documents are referred to in this opinion as Loan 2.

ever memorialized, however, and Loan 2's maturity date was never extended past July 3, 2016. SMI began meeting with Whitney on a weekly basis to submit funding requests for the upcoming week. While Lane testified that a loan officer at Whitney orally assured SMI that it would continue to fund payroll so that SMI could stay afloat, Whitney declined to fund payroll in late June 2016. At that time, SMI had borrowed the full $900,000 principal amount available under Loan 2.

Still, as Loan 2's July 3 maturity date loomed, SMI had steadily reduced the debt on Loan 1, with a total credit line of $1.5 million, to an amount just over $1 million. The Halliburton project was on schedule, with the delivery of two tanks imminent. Halliburton had agreed to make interim project payments for every two vessels produced rather than waiting until the end of the project. In light of this potential for earlier payment, Whitney and SMI communicated extensively about an extension of the lines of credit. However, except for the earlier extension of Loan 2's maturity date to July 3, 2016, the terms of Loans 1 and 2 were never altered. By Loan 2's July 3, 2016, maturity date, SMI had failed to repay any portion of that $900,000 loan.

Per the terms of both loan agreements, SMI's failure to pay by the maturity date triggered default on Loan 2 and a cross-default on Loan 1,[5] which meant that "all indebtedness immediately [became] due and payable, all without notice of any kind to [SMI]." Under the terms of the contracts, Whitney had the ability to exercise rights against the collateral securing the loans—all of SMI's accounts receivable. Loans 1 and 2 stated that in the event of default, Whitney could collect from SMI's customers and instruct them to make payments directly to Whitney to pay off the loans.

---

[5] A cross-default occurs when a provision of one loan agreement (here, Loan 2) states that a default on that loan puts a borrower in default on another obligation (here, Loan 1).

No. 18-31189

But Whitney did not immediately attempt to collect.  Instead, Whitney bankers met with SMI and Lane throughout July to attempt to devise a workout plan.  With SMI's cooperation, Whitney required all payments on the Halliburton project be made directly to the bank.  After SMI delivered the first two tanks, Halliburton sent the first payment on July 18, 2016, which reduced Loan 2's balance by almost half.  The six remaining tanks were on schedule for delivery in pairs.

Despite the ongoing negotiations between SMI and Whitney regarding Loan 2, on July 21, 2016, a Whitney loan officer notified Lane that Loan 2 was being moved to a new department in the bank, which SMI later discovered was the Special Assets department.  The Whitney officer also informed Lane that Whitney's commercial lending department, with whom SMI had been communicating and negotiating about Loan 2, should no longer be contacted.  Whitney did not provide an explanation for this shift.  A few days later, Whitney instructed Lane that he should direct all communication to Liskow & Lewis, Whitney's outside counsel.  SMI and Lane repeatedly but unsuccessfully requested that direct communication with Whitney be reestablished.

On August 5, 2016, Loans 1 and 2 were charged-off,[6] and two days later, Halliburton cancelled its project with SMI.  On August 18, Whitney's counsel made a written demand on SMI, advising that the SMI loans were in default and setting forth the principal and interest amounts due.  Whitney's counsel also sent demand letters to several SMI customers demanding payments directly to Liskow & Lewis.  In exercising its right to collect from SMI customers that owed money to SMI, Whitney did not coordinate its collection

---

[6] According to trial testimony, charged-off loans are no longer "active."  They are "loans that the bank has deemed to be of less than adequate asset quality and . . . no longer a bankable asset and are taken off the bank's books by charging to the loan loss reserve account."

5

efforts with SMI nor did it verify whether, or how much, any SMI customer owed.  As a result, notices were sent to SMI customers that did not owe SMI any money or had already paid the amounts they owed.  Whitney never provided SMI with copies of demands sent to SMI customers or advised of any amounts collected as a result of those demands.  After the notices were sent, some SMI customers canceled contracts.  On December 14, 2016, SMI terminated its operations.

While the money Whitney collected reduced the deficit that SMI owed on the defaulted loans, as of November 2016, SMI's debt to Whitney totaled around $1 million in principal and interest from the uncollected portions of the two defaulted SMI loans.  Whitney sued SMI and Lane to recover the unpaid balances on the two loans, plus accrued interest, contractual attorneys' fees, costs, and expenses.  In their answer, SMI and Lane asserted that they had no obligation to repay the loans because of Whitney's alleged breaches of contract, breaches of fiduciary duty, tortious interference with SMI's business relationships, and bad faith.  SMI also brought counterclaims for breach of contract, breach of duty to deal in good faith, negligent misrepresentation, and tortious interference with business relations.  The parties stipulated that neither loan was repaid in full by their respective maturity dates—July 31, 2016 for Loan 1, and July 3, 2016 for Loan 2.

After a bench trial, the magistrate judge determined that Whitney breached Loan 2 by failing to continue to advance funds to SMI as needed through completion of the Halliburton project.  The magistrate judge found that, though Loan 2 had an express maturity date of July 3, 2016, "it was the common intent of the parties . . . that the $900,000 revolving line of credit

created a production loan[7] or production credit that required the bank to fund that line of credit through the completion of SMI's contract with Halliburton." The magistrate judge explained that this was "apparent from the face of the business loan agreement, which states that the purpose of the loan was 'for a temporary overline to provide funds for a particular contract with Halliburton.'" Over Whitney's objections, the magistrate judge considered and relied on extrinsic evidence, including testimony from various Whitney employees and an expert witness hired by SMI.

The magistrate judge also found that Whitney breached Loan 2 "by requiring SMI to submit borrowing base certificates and [calculating] the amount of available funding based on a percentage of the eligible accounts receivable" because "[t]here is no provision in the loan documents for [Loan 2] requiring that advances be limited on the basis of the borrower's accounts receivable." The magistrate judge found that Whitney, in breaching Loan 2, violated the duties of good faith and commercial reasonableness and listed twenty-one "[e]xamples of Whitney Bank's breach of these duties." The magistrate judge then held that Whitney's failure to fund the Halliburton contract to completion constituted a "substantial breach" and that, as a result, SMI and Lane were relieved from repaying the uncollected principal and interest under Loan 2.

Having already ruled in favor of SMI on its breach of contract counterclaim, the magistrate judge next ruled in SMI's favor on its

---

[7] The magistrate judge stated that production loans are "loans made to cover the production of a crop or the construction or manufacture of an object such as the tanks that SMI contracted to build for Halliburton. A production loan requires a commitment from the lender that financing will be available to the borrower from before the 'production' or 'construction' starts through the completion of the project." With production loans, the magistrate judge explained, "the borrower and the lender have a full understanding that the loan last until the maturity of the production."

counterclaims for negligent misrepresentation, and tortious interference with business relations. He awarded SMI and Lane damages in the total amount of $3.5 million, equivalent to the court's estimate of SMI's enterprise value or, alternatively, its lost profits from customers it lost due to its demise. Next, the magistrate judge found that Whitney did not breach—and was entitled to fully recover and collect—all outstanding principal and interest on Loan 1. The magistrate judge denied Whitney's claim for contractual attorney's fees.

The magistrate judge entered judgment for Whitney and against SMI and Lane, as guarantor, for the outstanding principal and default interest balance on Loan 1, totaling $1,277,164.23. In the same judgment, the magistrate judge ruled that SMI and Lane were relieved from repayment obligations on Loan 2, and that, on their counterclaims, they were entitled to recover $3,500,000 from Whitney. Whitney timely filed a notice of appeal, and SMI and Lane cross-appealed.

We first review the magistrate judge's conclusion that Whitney breached Loan 2 but not Loan 1. Next, we evaluate SMI's remaining counterclaims for negligent misrepresentation, tortious interference with business relations, and breach of duty to deal in good faith. Finally, we review the denial of contractual attorney's fees to Whitney.

## II. BREACH OF CONTRACT

As explained in further detail below, SMI's breach of contract claim against Whitney fails for two reasons: First, under basic contract interpretation principles, the mere recital of the purpose of the loan, when read in conjunction with the rest of the document, did not require Whitney to continue to provide funding to SMI until that purpose was fulfilled, regardless of SMI's default and failure to make payment as required under the loans. Second, the remainder of SMI's breach claims are based on unwritten,

No. 18-31189

purported oral agreements between Whitney employees and SMI. These claims fail by operation of the Louisiana Credit Agreement Statute, whose purpose is to prevent precisely this type of claim.

## A. Breach of the Terms of Loans 1 and 2

We first evaluate the magistrate judge's conclusion that Whitney breached the terms of Loan 2. "Interpretation of a contract is the determination of the common intent of the parties." LA. CIV. CODE art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE art. 2046. Moreover, "when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under pretext of pursuing its spirit." *Id.* cmt. b (citing *Maloney v. Oak Builders, Inc.*, 235 So. 2d 386, 390 (La. 1970)). "In Louisiana, 'parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless there is ambiguity in the written expression of the parties' common intent.'" *Total E & P USA Inc. v. Kerr-McGee Oil & Gas Corp.*, 719 F.3d 424, 435 (5th Cir. 2013) (quoting *Blanchard v. Pan–OK Prod. Co.*, 32,764 (La. App. 2 Cir. 4/5/00); 755 So. 2d 376, 381). "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." LA. CIV. CODE art. 2049. "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE art. 2050.

The Business Loan Agreement for Loan 2 contained the following purpose of loan statement:

> APPLICATION FOR AND PURPOSE OF THE LOAN. Borrower
> has applied to Lender for a Loan in the aggregate principal amount
> of $900,000.00 for the following purpose: NEW LOAN REQUEST:
> LOAN PURPOSE FOR A TEMPORARY OVERLINE TO

No. 18-31189

PROVIDE FUNDS FOR A PARTICULAR CONTRACT WITH HALLIBURTON.

It had an express maturity date of April 3, 2016, which was later extended by the parties in writing to July 3, 2016. SMI agreed to repay the loan with interest at the date of maturity and granted a security interest in all its accounts receivable. At Loan 2's maturity date, Whitney had the contractual right "to insist upon immediate payment in full of the unpaid principal balance then outstanding under [the] Note, plus accrued interest, together with reasonable attorneys' fees, costs, expenses and other fees, and charges as provided [in the contract]." According to the terms of Loans 1 and 2, Whitney had "no obligation to make Loan Advances or to disburse Loan proceeds if . . . [SMI] or [Lane] is in default under the terms of this Agreement," including "default[ing] in the payment of principal or interest under the Note."

Construing the provisions of the loan documents so that each is given the meaning suggested by the parties' agreement as a whole, we conclude that, contrary to SMI's arguments and the magistrate judge's findings, the statement of the purpose of the loan did not require Whitney to continue advancing funds until the completion of the Halliburton projects. *See, e.g.*, *Lafargue v. United States*, 193 F.3d 516, 1999 WL 706064, at *5 (5th Cir. 1999) ("essentially agree[ing]" with the reasoning of two district courts that "the mere recital in the deed of the purpose for which the land conveyed was to be used is not in itself sufficient to impose any limitation or restriction on the estate granted" (alteration omitted)). "Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE art. 2050. "Legally, all of the terms of a contract must be read *in pari materia* so as to give each provision of the contract a meaning and practical consequence." *Lancaster v.*

10

*Petroleum Corp.*, 491 So. 2d 768, 777 (La. Ct. App. 1986). The magistrate judge's interpretation of the purpose statement as requiring Whitney to fund the Halliburton project through completion would render Loan 2's maturity date meaningless. It would also have been pointless for the parties to extend the maturity date of the loan from April 3, 2016, to July 3, 2016, if the loan's terms required Whitney to continue funding until the project was complete.

It is clear from the plain language of the contract that the parties intended that the loan mature on July 3, 2016, and that Whitney be paid on July 3, 2016, regardless of whether the Halliburton project was complete. *See Cash v. Liberty Ins. Underwriters, Inc.*, 624 F. App'x 854, 859-60 (5th Cir. 2015) (reversing the district court's finding that a contract was ambiguous under Louisiana law). If the parties had intended for Whitney to fund the Halliburton project to completion, or for the loan to mature only after the project was completed, "they could have drafted the contractual language that way . . . but they did not." *Id.* at 860.

Contrary to SMI's argument, the Louisiana concept of legal cause does not alter this analysis. In Louisiana, "[c]ause is the reason why a party obligates himself." LA. CIV. CODE art. 1967. Lawful cause is a requirement for contract formation, along with capacity, consent, and certain object. LA. CIV. CODE art. 1966; *Leger v. Tyson Foods, Inc.*, 95-1055 (La. App. 3 Cir. 1/31/96); 670 So. 2d 397. "The cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." LA. CIV. CODE art. 1968. For example, a contract to open an illegal gambling ring would be void for lack of lawful cause. SMI argues that Loan 2's purpose statement morphed into a binding contractual term by virtue of its being the cause of the contract. There is no support for this interpretation of the concept of cause in the Civil Code or Louisiana jurisprudence. The only

11

relevant inquiry into cause is whether the reason that a party obligated himself was lawful—and here, the reasons for each of the parties' obligations clearly were.

Because the contract's terms were unambiguous, the magistrate judge erred in disregarding "the letter of that clause . . . under pretext of pursuing its spirit." LA. CIV. CODE art. 2046 cmt. b.[8] Reviewing the plain text of the agreement, Whitney did not breach Loan 2 by refusing to fund the Halliburton project to completion or extend the maturity date.[9]

The magistrate judge also found that Whitney breached Loan 2 "by requiring SMI to submit borrowing base certificates and to calculate the amount of available funding based on a percentage of the eligible accounts receivable" because unlike Loan 1, Loan 2 did not expressly state that advances would be limited based on SMI's accounts receivable.

Reviewing de novo, Whitney's actions did not breach Loan 2. *Nat'l Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990). The magistrate judge did not identify which provision of the contract Whitney violated, and we find no written provision of Loan 2 that prohibits Whitney's action. *See Louque v. Allstate Ins. Co.*, 314 F.3d 776, 782 (5th Cir. 2002) ("To state a claim for breach of an insurance contract under Louisiana law, a plaintiff must allege a breach of a specific policy provision."); *Gulf Prod. Co. v. Petroleum Engineers, Inc.*, 2013-0578 (La. App. 4 Cir. 12/11/13); 2013 WL 6925002, at *2 ("In order for Gulf to assert a valid cause of action for breach of contract, it must allege a breach of a specific provision of the contract."). In fact, Loan 2 expressly

---

[8] The magistrate judge also erred in admitting parol evidence and expert testimony to aid in interpreting the unambiguous contract. *See Kerr-McGee*, 719 F.3d at 435.

[9] Because Whitney did not breach Loan 2, its breach was not "substantial," and therefore the magistrate judge erred in finding that SMI and Lane were excused from performance under the contract.

required SMI to submit borrowing base certificates at the end of each month and allowed Whitney to, "within its sole judgment, refuse to extend Loan Advances" under several circumstances, including when the amount requested would cause SMI to exceed its maximum line of credit, when SMI failed to provide satisfactory documentation to support the advance, or when Whitney "deem[ed] itself to be insecure with regard to the repayment of [SMI's] Loan and Note." Moreover, SMI does not argue that Whitney ever denied a disbursement from Loan 2 before its maturity date, and by the loan's maturity date, Whitney had loaned SMI the maximum amount available under Loan 2—$900,000.

Finally, applying these same principles of interpretation to the first loan, the magistrate judge correctly concluded that Whitney did not breach Loan 1.

## B. Breach of Oral Agreements

The Louisiana Credit Agreement Statute (LCAS), LA. REV. STAT. § 6:1121, *et seq.*, operates as a "statute of frauds" for the credit industry. *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 469 (5th Cir. 2006) (quoting *King v. Parish Nat'l Bank*, 2004-0337 (La. 10/19/04); 885 So. 2d 540, 546). Its purpose is "to prevent potential borrowers from bringing claims against lenders based on oral agreements." *Id.* (quoting *Jesco Const. Co. v. Nationsbank Corp.*, 2002-0057 (La. 10/25/02); 830 So. 2d 989, 992). The LCAS allows a debtor to file suit against a financial institution based on a credit agreement only where that "agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor."[10] LA. REV. STAT. § 6:1122. As relevant here, a

---

[10] Under the statute, a "creditor" includes a financial institution, a "debtor" is "a person or entity that obtains credit or seeks a credit agreement with a creditor or who owes money to a creditor," and a "credit agreement" is any "agreement to lend or forbear repayment

debtor is prohibited from bringing a claim against a creditor for any unwritten, unsigned agreement the creditor made, "such as entering into a new credit agreement, forbearing from exercising remedies under a prior credit agreement, or extending installments due under a prior credit agreement." *Id.* § 6:1123.

"[A]ll actions (or causes of action or theories of recovery) [against a creditor afforded protection by the LCAS] based upon an oral agreement to lend money are barred by the La. Rev. Stat. 6:1122." *Jesco Const. Co.*, 830 So. 2d at 992. For example, in *King v. Parish National Bank*, 885 So. 2d at 543, 548, the Louisiana Supreme Court held that a bank officer's oral promise to a customer that the customer's loan restructuring would not jeopardize his financial welfare "as long as he remained current in all his obligations with the bank" was an agreement to make a financial accommodation, and thus was a credit agreement that was unenforceable under the LCAS because it was not in writing. Similarly here, Whitney's alleged oral assurances to SMI— including that it would fund the Halliburton project to completion, that the maturity date would be extended, and that payroll would always be funded— were evidence of agreements to make financial accommodations to SMI or to forbear from exercising remedies under Loan 2 that must be in writing and signed by both parties to be enforceable under the LCAS. *See id.*; LA. REV. STAT. §§ 6:1122, :1123. None of SMI's claims to this effect are enforceable because they do not qualify as actions on a credit agreement under the LCAS.

SMI argues that *King* and other cases are inapposite because "[t]he evidence in this matter features explicit written contracts." The evidence in *King* featured explicit written contracts as well—to which additional

---

of money or goods or to otherwise extend credit, or make any other financial accommodation." LA. REV. STAT. § 6:1121.

modifications were added by oral agreement. *See King*, 885 So .2d at 542-43 (explaining that plaintiff consolidated his loans into a single promissory note and brought his cause of action based on oral assurance that the restructuring would not impair his welfare). That the underlying contracts are in writing is immaterial; SMI brings a claim based on oral assurances not memorialized in the written loan agreement, and therefore the LCAS bars its actions. *See Loraso v. JP Morgan Chase Bank, N.A.*, No. CIV.A. 13-4734, 2013 WL 5755638, at \*6 (E.D. La. Oct. 23, 2013) ("[A] promise . . . to modify, forbear, or refinance a loan . . . constitutes a credit agreement that would have to be in writing to be enforceable under the LCAS.").[11]

SMI's breach of contract counterclaim is based on Whitney's failure to fund the Halliburton project to completion. As explained above, this was not a requirement of the written loan agreement, and therefore any claim based on such an oral promise is barred by the LCAS. *See King*, 885 So. 2d at 548.

### III. SMI'S REMAINING COUNTERCLAIMS

We next evaluate the magistrate judge's conclusions as to SMI's counterclaims against Whitney for negligent misrepresentation, tortious

---

[11] In finding that SMI's claims were not barred by the LCAS, the magistrate judge relied on a line from the Louisiana Fourth Circuit's decision in *BizCapital Business & Industrial Dev. Corp. v. Union Planters Corp.*, 2003-2208 (La. App. 4 Cir. 9/8/04); 884 So. 2d 623, 627, stating that, in drafting a statute that stated that financial institutions do not owe general fiduciary duties to their customers or third parties, "the legislature did not intend to totally immunize banks from all legal duties in their relationship with customers and third parties." *BizCapital* is inapposite here. It involved a financial institution's misrepresentation to another financial institution regarding a debtor's solvency. This is unlike SMI's claims, which involve a debtor suing a bank on an oral agreement to make changes to a loan—the type of claim that falls squarely within La. Rev. Stat. § 6:1123 as an "agreement of a creditor . . . to take certain actions, such as entering into a new credit agreement" and therefore must satisfy, inter alia, the writing and signature requirements of La. Rev. Stat. § 6:1122. Moreover, the court in *BizCapital* was not interpreting the portions of the LCAS at issue here, sections 6:1122-23, which govern credit agreements between lenders and borrowers like Whitney and SMI. As explained above, *King* and *Jesco* are directly applicable.

interference with business relations, and breach of duty to deal in good faith.[12] As explained in detail below, each of SMI's counterclaims fails: SMI's claim for negligent misrepresentation, like its breach of contract claim, is barred by the LCAS; it fails to prove at least one of the elements of its tortious interference claim; and its claim for breach of duty to deal in good faith is not cognizable where Whitney has not breached a written term of the agreement.

## A. Negligent Misrepresentation

Similar to SMI's breach of contract claim, SMI's negligent misrepresentation claim was based solely on Whitney's refusal to fund the Halliburton project to completion. For the same reasons that SMI's breach of contract claim based on this oral representation fails, so too does SMI's negligent misrepresentation claim. *See King,* 885 So. 2d at 548.

## B. Tortious Interference with Business Relations

SMI also claims that Whitney tortiously interfered with its business through its aggressive collection efforts. To succeed on a tortious interference with business relations claim in Louisiana, a plaintiff must "prove by a preponderance of the evidence that defendants improperly influenced others not to deal with the plaintiff" and "were motivated by actual malice" in so doing. *Jeff Mercer, LLC v. State through Dep't of Transp. & Dev.*, 51,371 (La. App. 2 Cir. 6/7/17); 222 So. 3d 1017, 1024. "It is not enough to allege that a defendant's actions affected the plaintiff's business interests; the plaintiff must allege that the defendant actually prevented the plaintiff from dealing with a third party." *Henderson v. Bailey Bark Materials*, 47,946 (La. App. 2 Cir. 4/10/13); 116 So. 3d 30, 37. After plaintiff passes this threshold, he "must also establish that the interference was improper," *Dussouy v. Gulf Coast Inv.*

---

[12] SMI and Lane also brought counterclaims for breach of fiduciary duty, abuse of rights, and tortious interference with contract, which they later abandoned.

*Corp.*, 660 F.2d 594, 602 (5th Cir. 1981), "i.e., not to 'protect legitimate interests.'" *IberiaBank v. Broussard*, 907 F.3d 826, 841 (5th Cir. 2018) (quoting *Bogues v. La. Energy Consultants, Inc.*, 46,434 (La. App. 2 Cir. 8/10/11); 71 So. 3d 1128, 1134). Finally, a plaintiff must prove that the defendant was motivated by spite or ill will to satisfy the malice element. *Jeff Mercer, LLC*, 222 So. 3d at 1025; *Bogues*, 71 So. 3d at 1135.

Louisiana's law "is a significant deviation from the common law version of this tort, which requires intentional and improper conduct, but not a showing of ill will or actual malice." George Denegre, Jr. et al., *Tortious Interference and Unfair Trade Claims: Louisiana's Elusive Remedies for Business Interference*, 45 LOY. L. REV. 395, 403 (1999); *see also Junior Money Bags, Ltd. v. Segal*, 970 F.2d 1, 10 (5th Cir. 1992) ("This [Louisiana] tort does not appear to be as broad as it is under the Restatement or as [plaintiff] urges."); 8 LA. CIV. L. TREATISE, BUSINESS ORGANIZATIONS § 33:12 ("For many years, Louisiana was the only state in the country that refused to recognize any form of tortious interference with contract."). To even survive summary judgment on this action, the plaintiff "must come forward with evidence of ill will." Denegre, *supra*, at 404.

Louisiana "jurisprudence has viewed this cause of action with disfavor." *Bogues*, 71 So. 3d at 1135. Courts have explained that satisfying "the malice element . . . is difficult (if not impossible) to prove in most commercial cases in which conduct is driven by the profit motive, not by bad feelings." *Id.* (quoting *JCD Mktg. Co. v. Bass Hotels and Resorts, Inc.*, 2001-1096 (La. App. 4 Cir. 3/6/02); 812 So. 2d 834, 841). Indeed, SMI concedes that there appear to be no reported cases where a party has been held liable for this tort. *See id.* (quoting *JCD Mktg.*, 812 So. 2d at 841).

In *Lewis v. Huie-Hodge Lumber Co.*, the Louisiana Supreme Court found that the defendant, a company that operated sawmill plants, was not liable for tortious interference with business when it threatened to fire its employees if they dealt with the plaintiff, who had opened up a competing business, and convinced others in the area not to sell goods to the plaintiff. 46 So. 685, 686 (La. 1908). The court reasoned that because the defendant operated a store in competition with the plaintiff, it had a legitimate business interest in influencing others not to deal with the plaintiff. *Id.* The court explained: "The animus which led the defendant to take the course it did was not to injure the plaintiff, but to protect and safeguard its own business interest." *Id.*

In a tortious interference with contract case, a landlord, Frisard, sued a bank after the bank's attorney erroneously "sent a notice of eviction to Frisard's tenant telling her to vacate the premises as the property was to be seized and sold." *Frisard v. Eastover Bank for Sav.*, 572 So. 2d 343, 344 (La. Ct. App. 1990). The bank apologized and said they had the wrong address, but three months later, a bank representative went to the tenant's house and, when no one was home, left a message with a neighbor "to the effect that the mortgage was in default, the property was to be sold, and the tenant must move voluntarily or be evicted." *Id.* The bank's representative contacted the tenant three additional times with the same incorrect notice. *Id.* The Louisiana Fifth Circuit found no cause of action, explaining that "[t]ortious interference is an *intentional* act . . . not a *negligent* act." *Id.* at 347.

To succeed on its claim, SMI must prove that Whitney improperly, and motivated by "spite or ill will," not negligence, influenced third parties—SMI customers—not to deal with SMI. On this record, SMI's claim must fail.

There is no evidence that Whitney was driven by anything other than profit in its collection efforts. *See Scott v. Bank of Coushatta*, 512 So. 2d 356,

18

364 (La. 1987) ("Monitoring and collecting a loan are powers incidental to a state bank's express power to loan money."). Moreover, the express terms of the contract allowed Whitney to recover from SMI's customers because both loans were secured by SMI's accounts receivable. While it may have been more prudent and logical for Whitney to involve SMI in its collection efforts, those efforts, however brusque, served to protect the bank's legitimate interests— collecting on the defaulted loans. *See Lewis*, 46 So. at 687 (discussing another case where "it was legitimate for defendant[] to appropriate to itself all the customers it could command, even to the extent of driving plaintiff out of business").

SMI comes closest to establishing a tortious interference claim based on Whitney's sending collection letters to SMI customers who did not owe money to SMI at that time. The loan agreement allowed Whitney to send collection letters to SMI customers upon default, and there is no condition requiring that Whitney coordinate those efforts with SMI. The agreement did not, however, allow Whitney to demand money from customers that owed nothing. As the magistrate judge found, this had a negative impact on SMI's business, damaging its relationship with at least three customers.

Even if the letters that Whitney's attorney sent to SMI customers contained inaccuracies, however, in sending the letters, Whitney was attempting to collect on its loan; there is simply no evidence that it was motivated by any ill will toward SMI. Whitney's attempts to collect the amounts due after SMI failed to repay the loan, however clumsy, were pursuant to its legitimate business interest. Whitney's actions sound more in negligence, and Louisiana does not recognize a cause of action for negligent interference with contract or business relations. *See Frisard*, 572 So. 2d at 347; *Mahfouz v. Old Republic Ins. Co.*, 570 So. 2d 136, 138 (La. Ct. App. 1990)

19

(assuming district court dismissed negligent interference with business relations claim because "the law recognizes no cause of action").

Moreover, the magistrate judge's own findings undermine his conclusion that Whitney acted with actual malice. The court found the testimony of SMI's expert, W. Timothy Finn, credible. It specifically noted that Finn "opined that Whitney Bank likely made a macro decision to stop lending to the oil and gas industry which had a significant downturn even before [Loan 2]." The court later stated that "[a] corporate decision to cease lending to oil and gas service companies would explain the bank's change in course." This finding supports the conclusion that Whitney's actions were driven by a business decision and not by "spite or ill will," undermining the magistrate judge's finding of actual malice. *Bogues*, 71 So. 3d at 1135.

SMI cannot rely on its belief or assumption that Whitney was acting pursuant to some malicious motive other than protecting its legitimate interest in collecting on the loan—it must submit evidence. On this record, we find none.[13] In diversity cases, "it is not for us to adopt innovative theories of recovery . . . for . . . [Louisiana] law, but simply to apply that law as it currently

---

[13] The magistrate judge found malicious intent regarding the actions of two Whitney employees of the special assets department. These employees visited SMI facilities without familiarizing themselves with SMI's business, the Halliburton project, or the ongoing negotiations between Whitney and SMI. The magistrate judge also found that a Whitney employee instructed Whitney's attorney to begin collection efforts after asserting that Lane failed to provide the bank with the requested cash flow projections, though trial testimony confirmed that Lane provided all the requested information. After reciting these facts, the magistrate judge concluded "that those actions . . . were with ill will or malice." The court did not elaborate on how these actions constituted malice, and our review of the record reveals that the Whitney employees were acting pursuant to collecting on the loan—a legitimate business interest. We conclude that the magistrate judge's finding that Whitney acted with actual malice was clearly erroneous. *See Lewis*, 46 So. at 686; *see also Loraso*, 2013 WL 5755638, at *2 (dismissing plaintiff's claim against bank for tortious interference with business relations where bank repeatedly requested financial documents that customer had already sent and did not respond to customer's questions).

exists." *Mitchell v. Random House, Inc.*, 865 F.2d 664, 672 (5th Cir. 1989) (quoting *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1217 (5th Cir. 1985)); *see also Junior Money Bags, Ltd.*, 970 F.2d at 11 ("As a federal court sitting in diversity, we decline to significantly expand the scope of this very limited form of recovery."). Because Whitney had a financial motive in its collection efforts and we find no evidence indicating that Whitney was driven by spite or ill will, SMI's tortious interference claim based on Whitney's collection efforts fails.[14]

### C. Breach of Duty to Deal in Good Faith

SMI's final counterclaim is for breach of duty to deal in good faith. SMI claims that LA. REV. STAT. 10:1-01 *et seq.* imposes on all parties the duty of good faith dealing, which Whitney breached by withdrawing payroll funding, failing to continue negotiations, contacting an SMI customer directly for payment, funding at Whitney's discretion, funding "short of need or changed expected funding amounts," and collection efforts, generally. The magistrate judge agreed, listing several instances of Whitney's breach of the duty to deal in good faith.

"As a general rule, Louisiana recognizes an implied covenant of good faith and fair dealing in every contract." *Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997). Good faith governs the conduct of parties to a contract "in whatever pertains to the obligation." LA. CIV. CODE art. 1759. The Louisiana Revised Statutes state that "[e]very contract or duty within this Title imposes an obligation of good faith in its performance and enforcement." LA. REV. STAT. § 10:1-304.[15] The Civil Code defines good faith by reference to

---

[14] To the extent SMI's tortious interference claim against Whitney is based on its failure to fund the Halliburton project to completion, such a claim is barred by the LCAS. *See King*, 885 So. 2d at 548.

[15] Good faith here is synonymous with good faith as defined in the Civil Code. *See* LA. REV. STAT. § 10:1-304 La. rev. cmt. 2006 ("This section applies only to the general obligation

its "breach": "An obligor is in bad faith if he intentionally and maliciously fails to perform his obligation." LA. CIV. CODE art. 1997 cmt. b.[16]  The term bad faith "generally implies actual or constructive fraud or a refusal to fulfill contractual obligations, not an honest mistake as to actual rights or duties." *Delaney v. Whitney Nat'l Bank*, 96-2144 (La. App. 4 Cir. 11/12/97); 703 So. 2d 709, 718.

Whether a plaintiff may bring a cause of action for breach of good faith where the defendant was not actually in breach of the terms of the contract has been somewhat unclear in Louisiana.  In some cases, courts have treated the question of breach and the question of good faith exercise of contractual rights as different questions.  *See N-Y Assocs. v. Bd. of Comm'rs*, 2004-1598 (La. App. 4 Cir. 2/22/06); 926 So. 2d 20, 24; *Whitney Nat. Bank v. Reliable Mailing & Printing Servs., Inc.*, 96-968 (La. App. 5 Cir. 4/9/97); 694 So. 2d 479, 481 (evaluating whether bank acted in good faith in enforcing contract by selling property recovered after debtor defaulted on loan without finding that bank breached the contract).  In other cases, courts have held that a breach of good faith is only actionable when a party has breached the terms of the obligation.  *See Favrot v. Favrot,* 2010-0986 (La. App. 4 Cir. 2/9/11); 68 So. 3d 1099, 1110 ("[J]udicial determination of good-faith . . . failure to perform a conventional obligation is always preceded by a finding that there was a failure to perform, or a breach of contract.").

The Louisiana Supreme Court seemingly resolved this issue in *Lamar Contractors, Inc. v. Kacco, Inc.*, 2015-1430 (La. 5/3/16); 189 So. 3d 394, 397. There, the court analyzed Louisiana Civil Code article 2003, which states in

---

of good faith in the performance and enforcement of contracts. In those instances, the provisions of the Louisiana Civil Code shall govern as to the standard of good faith.").

[16] Article 1997 states that "[a]n obligor in bad faith is liable for all damages, foreseeable or not, that are a direct consequence of the failure to perform."

relevant part: "An obligee may not recover damages when his own bad faith has caused the obligor's failure to perform . . . . If the obligee's negligence contributes to the obligor's failure to perform, the damages are reduced in proportion to that negligence." The district court in *Lamar* found that Kacco, a subcontractor, breached the terms of a construction contract with its general contractor, Lamar, by failing to provide sufficient materials to complete the construction job. The district court also found that Lamar contributed to Kacco's breach by negligently withholding payments for completed work performed by Kacco. Significantly, however, Lamar did not violate any obligation owed under the contract in withholding the payments. Applying article 2003, the district court reduced the damages awarded to Lamar because it negligently withheld payments and contributed to Kacco's breach, despite finding that Lamar did not breach the terms of the contract. *Id.* at 397.

The Louisiana Supreme Court reversed, holding that "an obligor cannot establish an obligee has contributed to the obligor's failure to perform unless the obligor can prove the obligee itself failed to perform duties owed under the contract." *Id.* at 398. The court explained that Article 2003's damages bar "is correlative to the general duty imposed by La. Civ. Code art 1983, which requires '[c]ontracts must be performed in good faith.'" *Id.* at 397. The court stated that while the duty of good faith permeates all Louisiana contracts, "this general duty of good faith cannot be considered in isolation. Rather, it is necessarily regulated and circumscribed by the obligations imposed by the parties' contract." *Id.* at 398. The court cited approvingly the language in *Favrot v. Favrot*, stating that "we do not examine a party's good faith (or bad faith) unless and until we find that the party has failed to perform an obligation, from which the obligee has sustained damages." *Id.* (quoting *Favrot*, 68 So. 3d at 1109). This court recently addressed *Lamar*, affirming a

district court's conclusion "that the good-faith inquiry in Article 2003 is limited to situations where the obligee has breached." *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 655 (5th Cir. 2019).

*Lamar* prohibits a reduction in damages based on bad-faith acts unless the misbehaving party breached the terms of the contract. *A fortiori*, a non-breaching party's allegedly bad-faith acts cannot entitle the breaching party to *receive* damages if such acts do not entitle the breaching party to even a *reduction* in the amount of damages it owes. Because we have concluded that Whitney did not breach the terms of either loan, any claim regarding Whitney's violation of the duty of good faith fails.

The dissent maintains that Whitney breached its contract with SMI in demanding payments from SMI customers who at that time did not owe SMI any money. While acknowledging that "a violation of a general duty rather than a specific contractual duty or obligation must be resolved in tort," the dissent "would conclude that Whitney's duty to assert its security interest over only that which the contract allows is a specific contractual obligation and that the allegation of bad faith here may be brought in contract." Respectfully, we disagree. The dissent points to no provision of the loan documents that requires Whitney "to assert its security interest over only that which the contract allows." Because no contractual provision governs Whitney's conduct, Louisiana law compels that SMI's be brought in tort.

The case cited by the dissent, *Stephens v. International Paper Co.*, 542 So. 2d 35, 39 (La. Ct. App. 1989), provides an apt example. There, the Louisiana Court of Appeal for the Second Circuit held that a plaintiff's cause of action arose in tort as opposed to contract where a timber company that contracted with plaintiff to enter his property to cut and harvest timber

negligently left the gates on the property open, allowing plaintiff's cattle to escape. *Id.* The court reasoned that

> [a]lthough the law requires that one who is granted a servitude must use it in a proper manner, this is a general duty rather than a specific contractual duty or obligation assumed by the owner of the servitude; the breach of a general duty results in an action for damages "ex delicto," the breach of a special duty contained in the contract may result in an action for damages ex contractu.

*Id.* Plaintiff's action sounded in tort because "[t]he defendant did not contractually assume any special obligation pertaining to the duty of care to be exercised in the use of the servitude." *Id.*

Similarly here, Whitney's action potentially violated "a general duty rather than a specific contractual duty or obligation," and it therefore sounds in tort rather than contract. *See id.* There is no term of the contract that regulates the duty of care Whitney owed in collecting amounts from SMI customers, and therefore Whitney simply cannot be held liable in contract for its action. *See Little v. First Nat'l Bank of Jefferson*, 616 So. 2d 202, 203 (La. Ct. App. 1993) (holding that plaintiff's action against bank for breach of confidentiality "clearly sounds in tort" despite plaintiff's contention that it amounted to a "breach of a fiduciary duty arising out of a contractual relationship"); *Gulf Prod. Co. v. Petroleum Engineers, Inc.*, 2013-0578 (La. App. 4 Cir. 12/11/13); 2013 WL 6925002, at *2 ("[I]n order for [plaintiff] to assert a valid cause of action for breach of contract, it must allege a breach of a specific provision of the contract.").

The dissent claims that "[t]he specific grant of a security interest in one thing (debtors' accounts) means that attempting to assert an interest over another account where none was granted runs contrary to the parties' intent and is a breach." This proposition finds no support in Louisiana jurisprudence. *See Nicholson & Loup, Inc. v. Carl E. Woodward, Inc.*, 596 So. 2d 374, 396 (La.

Ct. App. 1992) (expressly adopting the distinction that a cause of action sounds in contract "[w]here [it] arises from breach of a *promise* set forth in contract" but sounds in tort "where it arises from a breach of *duty* growing out of contract" (alterations omitted) (emphasis added)); *Bergeron v. Pan Am. Assur. Co.*, 98-2421 (La. App. 4 Cir. 4/7/99); 731 So. 2d 1037, 1045 (dismissing breach of contract claims because "[t]he plaintiffs fail to point out any provision of the written insurance policies which have been allegedly breached by Pan American"); *Gulf Prod. Co. v. Petroleum Engineers, Inc.*, 2013-0578 (La. App. 4 Cir. 12/11/13); 2013 WL 6925002, at *2 ("[I]n order for [plaintiff] to assert a valid cause of action for breach of contract, it must allege a breach of a specific provision of the contract.  Consequently, even if there is a breach of duty arising out of a contractual relationship, but without an expressed promise in the contract, the action is *ex delicto*.").  While it may be true that when the contract does not provide for a particular situation, courts assume that parties "intended to bind themselves to the express provisions of the contract, as well as to whatever law, equity, or usage regards as implied," *Fleming v. Acadian Geophysical Servs., Inc.*, 827 So. 2d 623, 628 (La. Ct. App. 2002), there is no support for the proposition that a failure to abide by "whatever law, equity, or usage regards as implied" can form the basis of a breach of contract claim; only a breach of "the express provisions of the contract" can.  *See Gulf Prod. Co.*, 2013 WL 6925002, at *2.

In sum, because Whitney's action sounds in tort if at all, not contract, it cannot form the basis of SMI's claim for breach of duty to deal in good faith.

Finally, though SMI's complaint references only "breach of duty to deal in good faith," the magistrate judge referred to it as a "breach of . . . duty to deal in good faith and with commercial reasonableness."  He correctly explained that the Louisiana Revised Statutes contain a commercial

reasonableness requirement regarding a secured party's collection efforts after a debtor defaults. *See* LA. REV. STAT. § 10:9-607(c). It requires a secured party "to proceed in a commercially reasonable manner" if it "undertakes to collect from or enforce an obligation of an account debtor or other person obligated on collateral." *Id.*

When collecting on its collateral—SMI's accounts receivable—after SMI defaulted on the loan, Whitney was required to do so in a commercially reasonable manner. *See* LA. REV. STAT. § 10:9-607(c). If Whitney failed to collect collateral in a commercially reasonable manner, it "is liable for actual damages in the amount of any loss caused by [its] failure." *Id.* § 10:9-625(b). However, a creditor is shielded from liability where the collateral is used to eliminate or reduce the deficiency. *Id.* § 10:9-625(d). "[A] debtor . . . whose deficiency is eliminated or reduced . . . may not otherwise recover under Subsection (b) for noncompliance with the provisions of this Part relating to collection, enforcement, disposition, or acceptance." *Id.* The amounts Whitney collected from SMI's customers were applied to reduce SMI's deficiency on Loan 1. Therefore, commercially reasonable or not, SMI cannot recover for Whitney's failure to observe the standard of commercial reasonableness in its collection efforts because the funds recovered were used to reduce its deficiency on the loan. *See* LA. REV. STAT. § 10:9-625(d).

## IV. ATTORNEYS' FEES

Both loans stated that Whitney would be entitled to recover from SMI and Lane the bank's reasonable attorneys' fees, costs, and expenses. The magistrate judge declined to award Whitney its attorneys' fees, reasoning that "the conduct of Mr. Hebert, the attorney for the bank, in collecting on the sums owed to SMI by its customers actually contributed to the loss of SMI's business" and that Hebert had potential conflicts of interest with his client. For those

reasons, the magistrate judge found "it would be inequitable and unreasonable to permit the bank to recover any attorney's fees in this case, and no such damages will be awarded to the bank," particularly considering that SMI's president Lane attempted to cooperate in collection efforts upon Whitney's request.  The magistrate judge also required that each party would bear its own costs.

Though this court reviews for abuse of discretion, "the district court's discretion to deny the award is much more limited when the contract provides for attorneys' fees." *McDonald's Corp. v. Watson*, 69 F.3d 36, 45 (5th Cir. 1995). Still, "a court in its sound discretion may decline to award attorney's fees authorized by a contractual provision when it believes that such an award would be inequitable and unreasonable." *Cable Marine, Inc. v. M/V Tr. Me II*, 632 F.2d 1344, 1345 (5th Cir. 1980).  Whitney cites no case where this court reversed a lower court that declined to award attorneys' fees when those fees were provided for by contract.  *Cf. id.* at 1346 (declining to overturn district court's refusal to award attorneys' fees though the contract provided for them). The magistrate judge explained his decision, reasoning that such fees would be inequitable because the conduct of the bank's attorney in collecting amounts from SMI's customers without coordinating with SMI contributed to the loss of SMI's business.  Considering Whitney's attorney's behavior in failing to coordinate with SMI, demanding payment from customers who owed nothing to SMI, and the bank's cutting off all communication with SMI, the magistrate judge was within his discretion in declining to award attorneys' fees to Whitney.

\* \* \*

In sum, we AFFIRM the magistrate judge's ruling in favor of Whitney on its main demand for recovery under Loan 1. We REVERSE his ruling

No. 18-31189

against Whitney on its main demand for recovery under Loan 2 and REMAND for the magistrate judge to RENDER judgment in favor of Whitney on that claim. We REVERSE and REMAND for the magistrate judge to RENDER judgment in favor of Whitney on SMI's counterclaims for breach of contract, negligent misrepresentation, tortious interference with business relations, and breach of duty to deal in good faith. We AFFIRM the magistrate judge's ruling that Whitney is not entitled to recover from SMI for attorneys' fees and costs.

AFFIRMED in part, REVERSED in part, and REMANDED.

No. 18-31189

HAYNES, Circuit Judge, concurring in part and dissenting in part:

I concur in much of the judgment of the court, but I dissent in two respects.

First, I would affirm the district court's holding that sufficient evidence supported the finding of malice necessary for a tortious interference claim. Tortious interference in Louisiana is hard to prove, as it requires actual malice. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 601–02 (5th Cir. 1981). Often this requirement is insurmountable in the business context because of the "appropriate" motivation of profits. But I disagree with the notion that someone in a corporation who is seeking to collect money from another can never have actual malice or ill will towards that other. Corporations are run by humans, after all. As factfinder, the magistrate judge, who presided over the trial, found that Whitney acted with actionable ill will. The magistrate judge's decision rested in part on its determination that Whitney's employees lacked credibility, and we do not second-guess credibility determinations. *See Estate of Lisle v. Comm'r*, 541 F.3d 595, 601 (5th Cir. 2008) ("A trial judge's credibility determinations are due this extra deference because only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." (internal quotation marks omitted)).

Giving deference to fact-finding in the district court, as we are required to do, the only question before us is whether any facts support a conclusion of malice. A confession is not needed, of course, and circumstantial evidence will do. *Brown v. Petrolite Corp.*, 965 F.2d 38, 47 (5th Cir. 1992) ("[A] court or jury may infer actual malice from objective circumstantial evidence[.]"). Here, Whitney initially worked with SMI while trying to collect on the loan. Then,

30

all of a sudden, Whitney moved the loan to Special Assets based, at least in part, on false information. Whitney's representatives then appeared unannounced at SMI's headquarters and demanded that SMI and Lane sign a claim release and forbearance agreement. After SMI declined to sign a release unless it were reciprocal, the relationship turned ugly. The loans were cancelled, Whitney required any contact go through its attorneys, and Whitney began the key element of the tortious interference claim: sending demands to entities that did business with SMI but did not owe SMI anything. Given this series of facts and the magistrate judge's determination that Whitney's employees lacked credibility, I would hold that sufficient evidence exists to support the malice finding necessary for the tortious interference claim.

Second, I would affirm the district court's finding on SMI's bad-faith counterclaim. The majority opinion explains that, before reaching the question of bad faith, we must examine whether Whitney breached its obligations.[1] Majority Op. at 22–24. Here, the claim is that Whitney did so by making demands to non-debtors. The loan documents gave Whitney a security interest in SMI's accounts receivable and the right to "notify account *debtors* to make payments directly to [Whitney]" (emphasis added). The agreement did not, however, give Whitney the right to demand payment from *non*-debtors. So when Whitney made demands of customers who owed nothing to SMI and attempted to assert a security interest over something that the contract did not give Whitney claim to, Whitney did not perform in accordance with the contract's terms. While it is true that the contract does not expressly provide

---

[1] Although a violation of a "general duty rather than a specific contractual duty or obligation" must be resolved in tort—not contract, "in certain circumstances the same acts or omissions may constitute breaches of both general duties and contractual duties." *Stephens v. Int'l Paper Co.*, 542 So. 2d 35, 38–39 (La. Ct. App. 1989). I would conclude that Whitney's duty to assert its security interest over only that which the contract allows is a specific contractual obligation and that the allegation of bad faith here may be brought in contract.

that collecting from those who owe SMI nothing is a breach, courts assume that parties "intended to bind themselves to the express provisions of the contract, as well as to whatever law, equity, or usage regards as implied." *Fleming v. Acadian Geophysical Servs., Inc.*, 827 So. 2d 623, 628 (La. Ct. App. 2002). The specific grant of a security interest in one thing (debtors' accounts) means that attempting to assert an interest over another account where none was granted runs contrary to the parties' intent and is a breach. Considering the magistrate judge's conclusion that Whitney acted with ill will, the conclusion that Whitney's actions were not "mere bad judgment or negligence" but instead "the conscious doing of a wrong" is supported by the evidence. *MKR Servs., L.L.C. v. Dean Hart Constr., L.L.C.*, 16 So. 3d 562, 566 (La. Ct. App. 2009). Although I agree that SMI should be liable for defaulting on the loan, I would offset its obligation based on Whitney's breach.

Accordingly, I dissent from the majority opinion's decision to reverse as to the tortious interference and bad-faith counterclaims and the holdings inconsistent with these counterclaims. I otherwise concur.